AFRAN TRANSPORT COMPANY and Gulf Oil Corporation

v.

S/T MARIA VENIZELOS, in rem, Compagnia Maritima Istmenia, Ltda., in personam, Venizelos A. N. E., in personam, Venizelos Shipping (Agencies) Ltd., in personam, and S/S ORE MERCURY, in rem, Universe Tankships, Inc., in personam.

Civ. A. No. 75–2671.

United States District Court,
E. D. Pennsylvania.

May 11, 1978.

James F. Young and Thomas Fisher III, Philadelphia, Pa., for plaintiffs.

Sean J. O'Callaghan, Philadelphia, Pa., Lawrence J. Bowles, New York City, for defendants Venizelos.

Alfred J. Kuffler and Vernon C. Miller, Jr., Philadelphia, Pa., for defendants Universe Tankships.

## SUR PLEADINGS AND PROOF ON MOTIONS FOR RECONSIDERATION

LUONGO, District Judge.

On December 26, 1973, the Steamship William Larimer Mellon ran aground as it was proceeding up the Delaware River in a dense fog. On September 22, 1975, the owner and the time-charterer of the Mellon instituted this action, in which they contend that the grounding was caused by the negligent navigation of the Steamship Ore Mercury, which had proceeded upriver ahead of the Mellon, and of the Steamtanker Maria Venizelos, which was proceeding down the Delaware River.[1]

From November 29 to December 5, 1977, the case was tried to the Court on liability, and at the close of evidence I delivered findings of fact and conclusions of law from the bench. I found that the grounding was caused primarily by the negligent navigation of the Mellon, contributed to, in lesser degree, by the negligent navigation of the Ore Mercury and Maria Venizelos. Expressing those findings in terms of percentages of fault, as required by the Supreme Court in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), I allocated 70% of the fault to the Mellon, 25% to the Maria Venizelos, and 5% to the Ore Mercury.

Trial on damages was held on January 10–11, 1978. The parties stipulated that total damages resulting from the events on the date of the accident were $740,000, of which $220,000 was caused by the Mellon's efforts to unground. The defendants contended that the ungrounding damages should be charged solely against the Mellon and not allocated among the parties. At the close of the evidence, I again delivered findings and conclusions from the bench, holding that defendants were correct in their contention and that only $520,000 of the damages should be allocated in accordance with the percentages of fault in causing the grounding. I also held that plaintiffs were entitled to prejudgment interest.

■ Plaintiffs and the Maria Venizelos defendants have now moved for "reconsideration" of some of my findings and conclusions. I interpret their submissions as motions to amend findings and the judgment under Federal Rule 52(b).[2] Necessarily, the findings and conclusions that I delivered from the bench were rather general. Although I believe that those general findings are sufficient to dispose of this case, in light of the pending motions I shall now set forth the findings and conclusions in a more detailed form, modifying them as appears necessary after a more thorough review of the record. The findings of fact and conclusions of law set forth herein supersede those delivered from the bench.

1. Plaintiffs sued the two ships *in rem* and also sued their owners, operators, and managers. In this opinion, I shall refer to the defendants by the names of the ships.

2. Since 1966, admiralty actions have been governed by the Federal Rules of Civil Procedure. *See* Amendments to Rules of Civil Procedure, 383 U.S. 1029 (1966) (unifying civil and admiralty procedure); Fed.R.Civ.P. 1, 81. Rule 52(b) provides:

   "Upon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly."

   *See generally Browder v. Director*, 434 U.S. 257, 261–62 & n. 5, 98 S.Ct. 556, 559–60 & n. 5, 54 L.Ed.2d 521 & n. 5 (1978). *See also* Fed.R. Civ.P. 6(b).

Judgment in this case was entered on January 11, 1978. Notice of the Maria Venizelos defendants' motion was served on opposing counsel on January 18, 1978, and the motion was filed with the Court on January 23. Since the timeliness provision of Rule 52(b) speaks in terms of when a motion must be "made" rather than when it must be "filed", and "since a motion is 'made' by causing it to be served" (5A Moore's Federal Practice ¶ 52.11[1], at 2748 n. 8 (2d ed. 1977); *accord, Earnest v. Donald Deskey Assoc., Inc.*, 312 F.Supp. 1312, 1313 (S.D.N.Y.1970); *see* Fed.R.Civ.P. 5(d), 7(b)(1); *cf.* Fed.R.Civ.P. 5(e)), the Maria Venizelos defendants' motion was timely under Rule 52(b), and I have jurisdiction to consider it. Similarly, since notice of plaintiffs' motion was served on January 20, 1978, that motion was timely also, even though it was not filed until January 25.

## Findings of Fact

### A. *The parties and the ships*

1. Plaintiffs are Afran Transport Co., a business corporation with an office and principal place of business in Monrovia, Liberia, and Gulf Oil Corporation, a business corporation with its principal place of business in Pittsburgh, Pennsylvania.

2. At all times material to this suit, Afran owned the Steamship William Larimer Mellon, a single-screw steam-powered tank vessel having a length of 753 feet and a beam of 102 feet, 1 inch.

3. At all times material to this suit, Gulf was the time-charterer of the Mellon.

4. The Steamship Ore Mercury is a single-screw steam-powered combination oil and ore carrier having a length of 751 feet and a beam of 102 feet, 4 inches.

5. At all times material to this suit, the Ore Mercury was owned by defendant Universe Tankships, Ltd., a Liberian business corporation.

6. The Steamtanker Maria Venizelos is a single-screw steam-powered oil carrier having a length of 558 feet and a beam of 70 feet, 4 inches.

7. At all times material to this suit, the Maria Venizelos was owned by defendants Compagnia Maritima Istmenia, Ltda. and Venizelos A.N.E., two foreign business entities. It was operated by a third foreign business entity, defendant Venizelos Shipping (Agencies) Ltd.

### B. *Site of the accident*

8. The incident giving rise to this suit occurred in the Marcus Hook Range of the Delaware River. That "range" is a 4.25 mile[3] stretch of the river in the vicinity of the border between Pennsylvania and Delaware. The succession of ranges on the river from the Delaware Memorial Bridge, which spans the river just south of Wilmington, Delaware, to the intersection of the Delaware and Schuylkill Rivers is: Cherry Is-

land, Bellevue, Marcus Hook, Chester, Eddystone, Little Tinicum Island, Billingsport (which is adjacent to Paulsboro, New Jersey), and Mifflin (along which Hog Island is located). The normal width of the Marcus Hook Range channel is 800 feet. The upriver course on the range is 058 degrees true and the downriver course is 238 degrees true.

9. On the New Jersey (eastern) side of the Marcus Hook Range is a deep water anchorage marked on the National Ocean Survey maps as Anchorage No. 7. The water depth in the anchorage exceeds forty feet and the depth of the river to the New Jersey side of the anchorage exceeds thirty feet.

10. Marker buoys are located at various points along the Delaware River channel. The boundary between the Marcus Hook and Chester Ranges is marked by a flashing green buoy designated Chester Range Lighted Buoy 1C on the Pennsylvania (western) side of the channel and a "nun" buoy designated Chester Range Buoy 2C on the New Jersey side. Another flashing green buoy designated Marcus Hook Range Lighted Buoy 9M is normally located about six-tenths of a mile downriver from Buoy 1C on the Pennsylvania side of the channel. In the vicinity of Buoy 1C, an overhead power cable crosses the channel; it has an authorized clearance of 210 feet. To the Pennsylvania side of the channel, about .6 mile downriver of the boundary between the Marcus Hook and Chester Ranges, is the mouth of Stoney Creek, and about .5 mile below that point on the same side of the river is the mouth of Marcus Hook Creek.

11. From some time prior to and on December 26, 1973, a one-half mile length of the channel at the upper end of the Marcus Hook Range was restricted due to drilling, blasting, and dredging operations; a 500 foot wide portion of the channel on the Pennsylvania side of the river was closed to navigation. To mark the restrict-

---

3. Throughout this opinion, distances are measured in nautical (rather than statute) miles. A nautical mile equals approximately 6,080 feet.

ed area, colloquially referred to as the "cut", Buoys 9M and 1C were relocated to points at the westernmost edge of that 300 foot portion of the channel on the New Jersey side of the river that remained navigable and Buoy 2C was replaced with a red lighted buoy. In addition to the channel restrictions, the upper portion of the Marcus Hook anchorage, north of a line drawn perpendicular to the channel from the mouth of Marcus Hook Creek, was closed to anchored vessels. The Coast Guard issued periodic Notices to Mariners which advised seamen of the restrictions and requested voluntary one-way traffic in the cut and the granting of the right of way to ships travelling with the current, especially during the two hours prior to high water at Marcus Hook when deep draft vessels bound upriver would necessarily be scheduled to transit the area. The Notices also advised seamen "to establish right of way well in advance" of traversing the cut. Although these Notices to Mariners were phrased as voluntary, under general maritime custom and usage they were in fact mandatory directives.

12. On December 26, 1973, high water in the vicinity of the upper end of the Marcus Hook Range was predicted to occur at 1333 hours at a height of 5.8 feet. During the two hour period preceding high water at Marcus Hook the current was a flood tide running at a rate of 1.7 knots upriver on a course of 060 degrees true (*i. e.*, it had a "set" two degrees to the east of the Marcus Hook channel upriver course of 058 degrees).

C. *Events leading to grounding of the Mellon*

13. On December 26, 1973, the S/S Ore Mercury, under the command of Captain Alexandros I. Betsis, was inbound on the Delaware River carrying approximately 49,000 long tons of iron ore from Puerto Ordaz, Venezuela, to the United States Steel facility at Morrisville, Pennsylvania. The ship had a draft of thirty-eight feet, five inches fresh water. Between 0404 and 0407 hours on that morning, the ship stopped at

the Cape Henlopen pilot station at the mouth of the Delaware River, where it was boarded by Captain Donald M. Douglas, Jr., a duly licensed Delaware River pilot. The ship then proceeded upriver toward Morrisville.

14. On December 26, 1973, the S/S William L. Mellon, under the command of Captain Fortunato Galano, was inbound on the Delaware River carrying 49,639 long tons of crude oil from Escravos, Nigeria, to the Gulf Oil facility at Hog Island in Philadelphia. The ship had a draft of thirty-seven feet. At approximately 0400 hours on that morning, Captain Michael J. Linton, a duly licensed Delaware River pilot, boarded the ship from a pilot launch at Big Stone Beach in the lower Delaware Bay. At 0459, the ship commenced its passage up the Delaware River; it was astern of the Ore Mercury.

15. At about 0700, the Ore Mercury encountered a patch of fog in lower Delaware Bay, about forty miles south of Marcus Hook. At approximately 0750, the Mellon reached this patch of fog. The Mellon's pilot, Captain Linton, heard Captain Douglas of the Ore Mercury talking on the radio and called him to inquire about the visibility. · Douglas responded that he had encountered no bad visibility once he had traversed that patch of fog. At this time, the Ore Mercury was approximately ten miles ahead of the Mellon.

16. The Ore Mercury passed under the Delaware Memorial Bridge at 0929 and entered the Cherry Island Range; visibility was three to four miles. Captains Douglas and Betsis (the Ore Mercury's master) then learned from VHF radio conversations between vessels further upriver that visibility in the Marcus Hook area was very poor. By the time the Ore Mercury reached the middle of the Bellevue Range, visibility was deteriorating; the Ore Mercury began slowing its speed.

17. At 0946 on December 26, 1973, the S/T Maria Venizelos, under the command of Captain Demetrios Archontas, left the Mobil Oil docks at Paulsboro, New Jersey, and proceeded down the Delaware River,

headed for New York. The ship had a draft of twenty-four feet, six inches. At 0245 on that morning, Captain John H. Ahrens, a duly licensed Delaware River pilot, had boarded the ship. Departure, which had been scheduled for 0300, had been delayed because of cargo operations. Ahrens took over as pilot at about 0950, after the undocking was completed, and gave a full ahead order. Because of an inoperable high pressure turbine, the ship's speed downriver (against the flood current) at full ahead was only about five knots.[4]

18. It was raining in Paulsboro when the Maria Venizelos undocked, and visibility was one and one-half to two miles. Because of the rain, Ahrens did not anticipate fog downriver and he and Captain Archontas, the ship's master, decided to sail. No attempt was made to communicate with ships downriver to check on visibility conditions.

19. While he was piloting the Maria Venizelos, Captain Ahrens was aware of the navigation restrictions at the upper Marcus Hook Range.

20. At 0953, the Mellon passed under the Delaware Memorial Bridge, having slightly reduced its speed because of barges in the area. Captain Linton overheard radio conversations about reduced visibility upriver. By radio, he verified that tugboats would be available to dock the Mellon at Hog Island. He called ahead to the Ore Mercury, which at that time was in the middle of the Bellevue Range near Bellevue Range Lighted Buoy 6B, and Captain Douglas responded that he was encountering fog, that he might anchor at Marcus Hook if the fog got too thick, and that he would keep Linton informed of his intentions.

21. Because of worsening visibility, from 1000 the Ore Mercury continued slowing its speed with a series of slow ahead, dead slow ahead, and stop orders. The ship began blowing danger whistles—inland fog signals. At approximately 1006, the Ore Mercury entered the Marcus Hook Range. The fog was so dense that Captain Douglas

was unable to see the buoys as he passed them. He and Captain Betsis decided to anchor in the Marcus Hook Anchorage. The only other available anchorage between there and the Ore Mercury's Morrisville destination was the one at Mantua Creek (marked as Anchorage No. 9 on the National Ocean Survey maps), an anchorage on the New Jersey side of the Mifflin Range that was somewhat shallower and less preferred than the one at Marcus Hook. Since three or four ships were already anchored at Mantua Creek, Douglas and Betsis concluded that it would not be safe for the Ore Mercury to attempt to anchor there.

22. At 1004, the Mellon was on the Cherry Island Range near the intersection of the Delaware and Christina Rivers. Visibility was two to three miles, and various lookouts were stationed. The ship's engine orders at about this time varied between half ahead, at which the Mellon could sail at eight to eight and one-half knots in dead water (i. e., in water without a current), and slow ahead, at which it could sail at three to three and one-half knots in dead water. At approximately 1006, Captain Linton was informed by Captain Douglas that the Ore Mercury would anchor at Marcus Hook if it could find room in the anchorage. Despite this information, the Mellon did not reduce her speed. By 1015, the Mellon was on the Bellevue Range encountering progressively denser fog. On the bridge with Captains Linton and Galano (the master) were the helmsman, mate on watch, and lookouts on each wing; from the time the ship entered dense fog, a lookout was posted at her bow.

23. As the Ore Mercury proceeded up the Marcus Hook Range, Captain Douglas checked occupancy of the anchorage by radar, shifting from a four mile scale to a two mile scale and then to a one mile scale. There were three vessels in the anchorage, each of which was parallel to the eastern edge of the channel with its bow facing downriver, into the flood current. The lowermost and uppermost vessels were close to the edge of the channel, and the middle

4. One knot equals one nautical mile per hour.

vessel was deeper into the anchorage. There was space in the anchorage below the lowermost and above the uppermost vessels. Most of the upper space was in the part of the anchorage closed by the Notices to Mariners. Captain Douglas decided to anchor in the upper space, leaving the lower one for the Mellon.

24. While the Ore Mercury was preparing to anchor, the Maria Venizelos proceeded down the channel at about five knots. At about 1020, the ship was in lower Little Tinicum Island Range, about two and one-half miles from its point of departure, and it began to encounter reduced visibility. Captain Ahrens radioed the Ore Mercury to check on visibility downriver and was informed of Captain Douglas' plans to anchor in the upper part of Marcus Hook anchorage, about three and one-half miles from where the Maria Venizelos was then located. Despite reducing visibility, the Maria Venizelos continued down the channel without slackening speed. The ship's radar was set on a two-mile scale, and that scale was not expanded to check the position of the ships further downriver.

25. As the Ore Mercury was abeam of the lowermost vessel in the Marcus Hook anchorage, Captain Douglas radioed the Mellon and informed Captain Linton of his intention to anchor in the upper anchorage, leaving the lower spot for the Mellon. Linton replied that the Mellon was bound for Hog Island and would not be anchoring at Marcus Hook. By that time, the Ore Mercury was committed to taking the upper spot in the anchorage; it was too late for it to take the lower spot since it had gone too far up the channel.

26. The Ore Mercury continued up the Marcus Hook Range, navigating by radar. While it was still in the vicinity of the lowermost ship in the anchorage, the radar image of the uppermost ship in the anchorage, the Pella, blurred because the radar beam picked up the Pella and the nearby British Petroleum docks at approximately the same distance and location and showed them as a single object on the radar scope. Captain Douglas attempted to radio the Pella to confirm that it was not moving and that there was not an additional ship in the upper anchorage, but he received no response. Inquiries to the Curtis Bay tug office produced no additional information. At one point, Douglas had a radio conversation with Captain Ahrens on the Maria Venizelos in which he asked about Ahrens' radar view of the upper anchorage; Ahrens replied that his radar only showed one vessel in the upper anchorage. The radar image cleared as the Ore Mercury proceeded up the channel, revealing that the Pella indeed was the only vessel in the upper anchorage and that it was stationary.

27. Between about 1030 and 1035, the Mellon made the right turn onto the Marcus Hook Range. Captain Linton's engine orders continued to alternate between half ahead and slow ahead until 1040, when a dead slow ahead order was given. (At dead slow ahead the Mellon could sail at about three knots in dead water.) At about 1040, the Mellon was in the vicinity of Marcus Hook Lighted Buoy 1M in the lower Marcus Hook Range. It had travelled approximately 6.2 miles since 0943, when it had sailed under the Delaware Memorial Bridge, and its average speed during this forty-seven minute period was about eight knots. This was double the Mellon's bare steerageway (the minimum speed necessary for the ship to maintain steering control) which, in the 1.7 mile following current, was approximately four knots. (The bare steerageway of the Mellon in dead water is approximately two knots.) The Mellon's average speed over the 4.4 miles between its position on the lower Cherry Island Range where it first encountered reduced visibility at about 1004 and its position at 1040 was about 7.5 knots.

28. While it was in the lower Marcus Hook Range, the Mellon met, without incident, the tugboat Queen Bee, which was pushing a gasoline barge downriver. The tug and tow anchored in the space available in the lower Marcus Hook anchorage.

29. The Ore Mercury continued to sail up the Marcus Hook Range at a slow speed. Captain Douglas visually sighted the Pella,·

the northernmost ship in the anchorage, as the Ore Mercury passed within about one hundred feet of it, and he then began anchoring maneuvers, using the visual location of the Pella as a guide. The Pella was in the anchorage at the edge of the channel with its bow facing southward into the current. Upon passing the Pella, at a point near the southern boundary of the closed portion of the anchorage, Douglas gave a hard starboard order which brought the bow of the Ore Mercury to the right, past the Pella's stern. Slowly, he steered the front of the Ore Mercury into the anchorage with a series of dead slow ahead and stop orders. At 1049, he gave a full astern order to stop the ship's forward momentum; by this time, the bow of the Ore Mercury was in the anchorage to the New Jersey side of the Pella, but the stern was still in the channel. At 1050, Douglas issued a stop order and had the anchor and 180 feet of chain dropped from the ship's bow. He then continued to steer the ship to the right (hard starboard) as he gave the following engine orders:

| | |
|---|---|
| 1051 | slow ahead |
| 1054 | stop |
| 1055.5 | dead slow ahead |
| 1057 | slow ahead |
| 1059.5 | half ahead |
| 1100.5 | slow ahead |
| 1101 | half ahead |

He did not want to move the ship too quickly for fear of grounding it in the shallow water to the New Jersey side of the anchorage. The anchor, which had been dropped from the bow on a relatively short chain, was to drag along the bottom of the anchorage, deterring movement of the bow and allowing the ship's stern to swing clockwise out of the channel and into the anchorage. The result would be that the Ore Mercury would be out of the channel in a position astern of the Pella and straddling the southern boundary of the closed sector of the anchorage with its bow facing downriver into the current.

30. As the Ore Mercury was anchoring ahead of it, Captain Linton attempted to slow the Mellon's speed by issuing a dead slow ahead order at 1040 and a stop order at 1053.5. Linton watched the progress of the anchoring on his radar and became concerned that the Ore Mercury was not swinging out of the channel quickly enough. He made radio calls to Captain Douglas, requesting that the Ore Mercury move more quickly. Douglas, who had not kept a steady watch for the Mellon or posted a stern lookout, responded that he was attempting to get his ship out of the way.

31. On the Maria Venizelos, Captain Ahrens heard the radio conversations about the Ore Mercury's anchoring and Captain Linton's intention to sail the Mellon to Hog Island. At 1053, when his ship was in the lower Chester Range, south of the Commodore Barry Bridge, he gave a half ahead order to reduce speed. The radar scale was reduced from two miles to one mile. By this time, the ship had entered very heavy fog. In conversations with Captains Douglas and Linton, Ahrens assured them that since his ship was light draft and was sailing against the current, he would avoid getting into their way. The Maria Venizelos was just above the cut in the upper Marcus Hook Range and Ahrens had a number of options: he could continue down the channel into the cut and toward the oncoming Mellon and the anchoring Ore Mercury; veer to the left and enter the shallower water to the New Jersey side of the Marcus Hook anchorage, cutting across the bow of the anchoring Ore Mercury; veer to the right into the restricted river area; or reduce speed and stem the flood tide, remaining above the cut until the Ore Mercury completed anchoring and the Mellon had traversed the cut. Ahrens elected to continue his course down the channel and into the cut. When the captain of a ferry boat asked if he could cross the river ahead of the Maria Venizelos, Ahrens asked him not to cross until after his ship cleared the channel; although Linton overheard that conversation, he did not ask Ahrens to remain above the cut.

32. From the time it turned onto the Marcus Hook Range until the 1053.5 stop order, the Mellon had been steered on an average course of about 057.4 degrees; the

slight difference between the direction steered and the channel heading of 058 degrees true was necessary to compensate for the two degree eastward set of the current. When he became concerned that the Ore Mercury was not swinging quickly enough, Captain Linton began to steer the Mellon further to the left, and from 1054 to 1103 the average course steered was about 055.7 degrees, which brought the Mellon to the center of the channel. According to the Mellon's deck bell book (which differs slightly from the ship's engine bell book), Linton's engine orders during this period were—

| | |
|---|---|
| 1054 | dead slow ahead |
| 1055 | stop |
| 1100 | dead slow ahead |
| 1100.5 | slow ahead |
| 1101 | half ahead |
| 1102 | slow ahead |
| 1102.5 | stop |

Linton continued to urge the Ore Mercury, whose stern still extended a short distance into the channel, to swing more quickly. Eventually, he decided that he had to steer further to the left to avoid the Ore Mercury. At about 1103, Linton gave a full ahead order and began a sharp left turn to a heading of about 046.8 degrees. This heading took him to the Pennsylvania side of the channel. According to the deck bell book, Linton's engine orders during this turn were—

| | |
|---|---|
| 1103.5 | stop |
| 1104 | slow ahead |
| 1104 | half ahead |

As he made the turn, Linton blew the danger signal on the ship's whistle. On the Ore Mercury, Captain Douglas believed that by this time his ship had cleared the channel, but, out of concern for the oncoming Mellon, he too gave a full ahead order at 1103 to be sure that his stern was clear; this was followed by a slow ahead order at 1104 and a stop order at 1106. At abut 1104–05, the Mellon passed the Ore Mercury,[5] whose stern had just swung free of the channel, at a distance of about 600 feet. The Mellon had sailed about 2.6 miles from Buoy 1M to the point where she passed the Ore Mercury in about twenty-five minutes, for an average speed of about 6.24 knots during that period.

33. At about 1100, while the Mellon was attempting to avoid the Ore Mercury, the Maria Venizelos entered the cut. To slow his ship, Captain Ahrens issued a stop order at 1058 and a slow ahead order at 1059; his ship sailed through the cut at about 4.5 knots. When the Maria Venizelos was about one-tenth of a mile into the cut, Ahrens was able to see the Ore Mercury on his radar scope at a distance of about one mile. He continued to watch the Ore Mercury as he proceeded through the cut. When Captain Linton announced that he was turning left into the Pennsylvania side of the channel, Ahrens suggested that the Maria Venizelos sail into the shallow water to the New Jersey side of the anchorage to avoid the Mellon, but Captain Douglas objected that such action would interfere with the Ore Mercury. It also was suggested that the Mellon turn into the anchorage, but Linton replied that it was not possible for the Mellon to make that drastic a turn. Ahrens then decided to run his ship aground, and, at about 1106, when he was at the lower end of the cut approaching relocated Buoy 9M, he gave a hard starboard order and a full ahead order to take his ship hard to the Pennsylvania side of the channel. Meanwhile, after passing the Ore Mercury at about 1105, Linton gave a hard starboard order and a full ahead order to get back to the New Jersey side of the channel. Linton and Douglas, both of whom had been preoccupied with the Mellon's maneuvers past the Ore Mercury, were surprised when they realized that the Maria Venizelos had proceeded through the cut. By about 1107, the Maria Venizelos was within the half-mile range of the Mellon's radar. (Linton had his radar set at one-half

5. At 6.24 knots, it would take about 1.2 minutes for the entire 753 foot length of the Mellon to pass any fixed point. Of course, at a slower speed the time of passage would be longer, e. g., about 1.5 minutes at five knots or about 1.9 minutes at four knots. The Mellon had been reducing speed prior to reaching the Ore Mercury.

mile while he was navigating past the Ore Mercury.) In a radio conversation, Ahrens and Linton agreed to pass each other port-to-port, and each continued his starboard turn, except that, at one point when. the ships were close to passing each other, Linton gave a left rudder order to get the Mellon's stern to swing to the right more quickly. According to the Mellon's deck bell book, Linton gave a slow ahead order at 1105.5 and a dead slow ahead order at 1108. The ships passed port-to-port at a distance of 100 to 300 feet at about 1108–10, and Ahrens gave a left rudder order to attempt to get back on course. Shortly after that order was given, at about 1109–10, the Maria Venizelos ran aground beyond the Pennsylvania side of the channel, less than a quarter of a mile below relocated Buoy 9M, near Stoney Creek. Although the charts mark that area as rocky, the Maria Venizelos suffered no major damage and was able to unground in a short period of time.

34. Captain Linton continued to steer the Mellon hard starboard, but he felt that his ship was not responding adequately because of hydrodynamic interaction ("suction") with the Maria Venizelos as it passed at close range. He attempted to pass to the right of Buoy 9M as a means of steering into the cut. At about 1112, at a point near the bow, the Mellon ran aground near the center of the channel. The ship turned slightly to port, and Linton issued a stop order at about 1113. The Mellon's forward momentum and the 1.7 knot current continued to drive the ship forward, and the stern, which still had a hard right rudder,

pivoted 180 degrees in a clockwise direction until it too ran aground. When the upriver momentum ceased, the Mellon was grounded near her bow and stern in the center of the channel in 37.5 feet of water (i.e., water having a mean low water depth of about thirty-four feet).[6] She was just south of the overhead power cable and was facing downriver on a reciprocal heading to her upriver course. The grounding of the stern caused the No. 2 Port Wing Tank to rupture, resulting in a loss of oil. In all, the grounding itself (as opposed to actions while attempting to unground the ship) caused damage to the Mellon amounting to $520,000.

D. *Assessment of conduct leading to the grounding of the Mellon*

35. The Mellon was at fault for operating at excessive speed. Between 1000 and 1010, the Mellon entered the fog and learned that the Ore Mercury would be anchoring ahead of it. From that time, she should have slowed to bare steerageway (about four knots). Instead she travelled at nearly double that speed until she reached Buoy 1M and was still proceeding at an average of about 6.24 knots as she approached the Ore Mercury. The excessive speed of the Mellon, which placed her in the upper Marcus Hook Range before she should have arrived there and which lessened the possibility of evasive action once such action became necessary, was the principal factor contributing to the Mellon's grounding.

36. The Mellon was at fault for failing to make adequate use of her radar in mea-

---

6. Although the Mellon had a draft of thirty-seven feet when standing in fresh water, it tended to move through the water at a slightly deeper depth ("squat") of about 37.5 feet, and it therefore would not run aground in water deeper than that level. At the time of grounding, the height of the flood tide was about 3.5 feet above mean low water. Since the soundings on the survey charts are marked at the mean low water level, the Mellon had to have grounded in water charted at thirty-four feet or less.

Efforts to locate the obstruction on which the Mellon grounded have been unsuccessful. At trial, the Maria Venizelos defendants intro-

duced a series of charts showing soundings taken in the Marcus Hook Range following dredging in the area. One chart, Ex. MV 24C, shows a shallow spot 33.7 feet below mean low water near the center of the channel just south of the overhead power cable. The survey from which that chart was made was taken in November 1973, however, and the Maria Venizelos defendants admit that the Army Corps of Engineers claims to have redredged the area before the date of the accident. The chart based on the next survey, taken in January 1974, Ex. MV 24D, does not show the shallow spot.

suring speed. Captain Linton apparently believed that he had slowed to bare steerageway when in fact he had not. He could have calculated the ship's true speed by making measurements with his radar, but he did not do so, and, as a result, proceeded up the channel at excessive speed under the circumstances.

37. The Mellon was at fault for failing to make adequate use of her radar in determining the positions of the Ore Mercury and, especially, of the Maria Venizelos as the Mellon proceeded up the channel. Although he heard Captain Ahrens tell the ferry captain that the Maria Venizelos was going to proceed down the channel, Captain Linton did not look for the Maria Venizelos in his radar and, because of the small radar scale he was using, did not see her in his radar until shortly after he passed the Ore Mercury. The radar was not adequately used to measure the Mellon's distance from the Ore Mercury and the Maria Venizelos.

38. The Mellon was at fault for failing to make a timely agreement with the Ore Mercury before passing the Ore Mercury. Given the dense fog and the excessive speed of the Mellon, the Mellon should have communicated with the Ore Mercury as to her approximate time of passage to aid the Ore Mercury in timing her anchoring maneuvers. This communication should have occurred earlier than the Mellon's last-minute calls to the Ore Mercury to get out of the way.

39. The Ore Mercury was at fault for failure to communicate with the Mellon about her anchoring plans before committing herself to the upper space in the anchorage. Captain Douglas mistakenly assumed that the Mellon would be anchoring and therefore would need the lower available space in the anchorage. He therefore committed his vessel to the upper space in the anchorage, although he knew that the Notices to Mariners had declared most of that upper space closed to anchoring vessels to facilitate navigation of the restricted cut. Had Douglas communicated with the Mellon beforehand, he would have learned that Captain Linton did not intend to anchor.

He then could have anchored the Ore Mercury in the lower space in the anchorage, where his anchoring activities would not have presented a hazard to vessels attempting to traverse the cut.

40. The Ore Mercury was at fault for not maintaining an adequate watch for the Mellon. Captain Douglas should have known that the Mellon was approaching astern at a rapid rate; nevertheless, no stern lookout was stationed and only sporadic attention was paid to the Mellon's position on radar.

41. The Ore Mercury was at fault for not swinging her stern out of the channel quickly enough. The Ore Mercury's anchoring maneuvers were proper and, under normal circumstances, were not unduly lengthy. However, in light of the fact that the Mellon was approaching astern at a rapid rate in a dense fog and was making repeated requests for the Ore Mercury to move over, the Ore Mercury should have moved more rapidly to complete her swing out of the channel. Because she did not do so, her stern still protruded slightly into the channel at the time the Mellon was approaching, forcing the Mellon's left turn.

42. The Maria Venizelos was at fault for leaving her berth at Paulsboro without ascertaining the weather and visibility conditions downriver. At the time that she set sail, the fog on the Marcus Hook Range was very dense and radio conversations among ships in that range commented on that fact. The Maria Venizelos' master and pilot should have been aware of the poor conditions downriver and, in light of them, should not have set sail when they did.

43. The Maria Venizelos was at fault for operating at excessive speed under the circumstances. Although she entered the fog at about 1020 and learned of the Ore Mercury's plans to anchor shortly after that time, she continued downriver at full ahead until 1053, when she was in the lower Chester Range.

44. The Maria Venizelos was at fault for failing to make adequate use of her radar in determining the positions of the Ore Mercury and the Mellon. Although Captain

Ahrens knew that the Ore Mercury was anchoring and that the Mellon was proceeding upriver, he kept his radar on a low scale and did not watch the movements of the ships further downriver.

45. The Mellon and the Maria Venizelos were both at fault for failing to make a timely agreement for the meeting of the two vessels. Since they were proceeding toward each other and it reasonably could have been predicted that they would meet in the fog in the vicinity of the cut, a timely agreement should have been made well ahead of time. Such an agreement was required by the Notices to Mariners setting forth the restrictions in the cut. Nevertheless, an agreement was not made until the very last minute.

46. The Maria Venizelos was at fault for failing to remain above the cut until the Mellon had passed. Of the various options open to her, the one chosen—proceeding into the cut—was the least prudent. Before entering the cut, Captain Ahrens knew that the Ore Mercury was anchoring in the upper anchorage, that the Mellon was proceeding upriver and was complaining about the Ore Mercury's delay in swinging, that the Maria Venizelos could stem the flood tide without any difficulty, and that the cut was a restricted area in which he was required to yield the right-of-way to deeply-laden vessels headed upriver. By proceeding into the cut, the Maria Venizelos interfered with the Mellon's navigation, hindering her attempt to return to a proper course after her left turn. But for the Maria Venizelos' presence in the cut, the Mellon would have been able to return to her proper course.

47. The Mellon was at fault for failing to make known her objection to the Maria Venizelos' entrance of the cut. When he heard Captain Ahrens tell the ferry captain that the Maria Venizelos would proceed down the channel to the cut, Captain Linton should have stated his objection, but didn't.

48. The Maria Venizelos was at fault for failing to move out of the cut before her presence there required the Mellon to take evasive action to avoid collision. After entering the cut, Captain Ahrens should have known of the Mellon's approach and, rather than waiting until 1006 when he got to Buoy 9M, should have made his right turn a few minutes sooner. Had he done so, the Maria Venizelos' interference with the Mellon would have lessened.

49. The Mellon was at fault for not returning to her proper course after meeting the Maria Venizelos. The Maria Venizelos' interference interrupted the Mellon's effort to return to her proper side of the channel to enter the cut, making it difficult for the Mellon to orient herself. Nevertheless, the four or five minutes between the meeting and the grounding should have provided sufficient time for the Mellon to take appropriate sightings and return to her course. This fault of the Mellon was not so great as to be a supervening cause of the grounding.

50. The percentages of fault for the Mellon's grounding are:

| Mellon | 70% |
| Maria Venizelos | 25% |
| Ore Mercury | 5% |

E. *Ungrounding of the Mellon*

51. One of Captain Linton's first acts upon grounding was to notify the Coast Guard and to call for tugs and barges. The tugs and barges were dispatched. It would have taken about one hour for them to reach the Mellon and could have taken an additional one-half hour to hook up to the Mellon. The tugs and barges therefore should have been able to service the Mellon by about 1245, forty-five minutes before high tide. After calling for the tugs and barges, Linton failed to check on their estimated time of arrival.

52. Because the Mellon's No. 2 Port Wing Tank had ruptured, causing leakage of cargo, Captain Galano had the oil pumped from that tank into the No. 8 Port Wing Tank.

53. Extensive soundings (measurements of the water depth) should have been taken, but few, if any, were. Soundings involve the dropping of a weighted line over the

side of the ship at various points and the measuring of the length of line to reach bottom. Soundings should have been taken at twenty or thirty foot intervals along the ship. Doing so with one line would have taken about two hours. If any soundings were taken, Captains Galano and Linton did not use them in deciding how to attempt to unground.

54. Because the stern (with the rudder and propeller) swung freely after the bow of the Mellon ran aground and because Captains Galano and Linton erroneously believed that it was about high tide and the tide would soon begin to drop rapidly, Galano and Linton decided to use the ship's engines to attempt to unground. Following the 1113 stop order, Linton's engine orders were:

| 1115 | full ahead |
| 1118 | slow ahead |
| 1118.5 | full ahead |
| 1125.5 | dead slow ahead |
| 1129.5 | slow ahead |
| 1142.5 | full ahead |
| 1158.5 | half ahead |

As a result of these engine orders, the Mellon scraped hard against the rocks of the riverbed, incurring additional damage amounting to $220,000. Although the initial use of the ship's engines was reasonable to probe the severity of the grounding, the later attempts to move forward—particularly the seven minute full ahead order at 1118.5 and the sixteen minute full ahead order at 1142.5—were highly imprudent. The stern had stopped swinging and had grounded, the ship was known to be in or near a very narrow channel of deep water surrounded by a very rocky area, the ship was losing oil,[7] the tide was still rising (although Galano and Linton didn't check the tide tables to ascertain that), and the tugs and barges were on the way. Under these circumstances, use of the ship's engines to drive her forward was so negligent as to be a supervening cause of the additional damage caused by scraping the riv-

erbed, and the defendants therefore should not be held liable for any part of that additional damage.

55. The tide continued to rise and the Mellon ungrounded at about 1200. Its stern ungrounded first, and the ship's engines caused her to swing counterclockwise so that the Mellon again headed upriver. By 1204, the Mellon was sailing under the Commodore Barry Bridge on the Chester Range.

### F. Repairs and suit

56. When the Mellon reached Hog Island between 1300 and 1330 it was too foggy to dock. With the aid of tugboats, the Mellon anchored abeam of the dock in the Mantua Creek anchorage. Temporary repairs were made while the Mellon was at Hog Island.

57. Permanent repairs were made to the Mellon in dry dock at Schiedam (near Rotterdam) in the Netherlands in January 1974. The total cost of repairs was $740,-000, most of which was paid on April 23, 1974.

58. Plaintiffs instituted this action on September 22, 1975. The action has been prosecuted in a reasonable manner and with due diligence, and the delays occasioned prior to trial were reasonable.

### Discussion

The motions for reconsideration are addressed to the allocation of fault for the grounding of the Mellon and the holding that plaintiffs should bear the sole responsibility for damages suffered by the Mellon during ungrounding efforts. I shall briefly discuss some of the points raised by the moving parties on those questions.

### A. Allocation of Fault for the Grounding

With respect to findings of fault on the part of the Mellon, the only specific finding to which plaintiffs object in their motion for reconsideration is the finding that the

---

7. Because of the oil loss, it would have been prudent to remain stationary so that the obstruction that punctured the cargo tank would remain in place to plug the opening and lessen the oil seepage.

Mellon was at fault for failing to make a timely agreement with the Ore Mercury before passing her. Plaintiffs contend that the Mellon had no duty to make such an agreement and that the only duty owed to the Ore Mercury was to avoid striking her. They distinguish cases cited by the Ore Mercury defendants in support of a duty to make such an agreement [8] by asserting that those cases were governed by Article 18 of the Inland Rules of the Road, 33 U.S.C. § 203,[9] which does not govern the passing of anchoring vessels.

■ Having considered plaintiffs' arguments, I adhere to the finding (now numbered 38) that the Mellon's navigators should have made a timely agreement. The question is one of negligence—*i.e.*, what a reasonable and prudent seaman should have done under the circumstances. In the situation facing the Mellon, I believe that a timely agreement—one made prior to the Mellon's desperate urgings that the Ore Mercury move out of the way—would have been prudent. Because of the fog, the Ore Mercury's personnel could not visually watch the Mellon's approach; they would have benefitted from whatever additional information could have been made available to aid them in completing their swing out of the channel before the Mellon reached them. A seaman may not neglect to take precautions required by the special circumstances of a case. Inland Rules of the Road, Article 29, 33 U.S.C. § 221. The special circumstances of this case—close

passage of an anchoring vessel in a narrow channel in dense fog—mandated the precaution of an advance agreement as to the time of passage. The Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. §§ 1201–1208, established a communications system for just such purposes,[10] and the Mellon's personnel should have used it here.

The Maria Venizelos defendants' motion for reconsideration attacks the original finding that the pilot of the Maria Venizelos "had advised the Mellon that he would hold back until the [Ore] Mercury anchored but advised the Mellon not to worry since the Maria had a light draft and could go anywhere." The Maria Venizelos defendants argue that the pilot never promised to remain above the cut but merely stated that he would get out of the Mellon's way. After reviewing the evidence, I have modified the finding (now numbered 31) on this matter. This alteration has no effect on the ultimate outcome, however. The Mellon's personnel were justified in believing that the Maria Venizelos would stay out of the way by taking the most prudent action advisable in her situation—staying above the cut. The fact that the Maria Venizelos' pilot did not specifically say his ship would do so is of little significance.

The Maria Venizelos defendants' major challenge is to those findings which stated that the Mellon's personnel learned of the Maria Venizelos' presence in the cut after passing the Ore Mercury, were forced to take evasive action (culminating in close

---

8. *E.g., Ira S. Bushey & Sons, Inc. v. Standard Oil Co.,* 197 F.2d 788 (2d Cir. 1952); *The Pilar de Larrinaga,* 42 F.Supp. 648 (E.D.Pa.1942).

9. The "Inland Rules of the Road" are a series of statutory rules for the navigation of harbors, rivers, and inland waterways enacted by the Act of June 7, 1897, ch. 4 § 1, 30 Stat. 96, as amended, 33 U.S.C. §§ 154–156, 171–183, 191–192, 201–213, 221–222, 231–232. The Rules are set forth as a series of "articles", each of which has been codified as a separate section of the United States Code. Article 18 deals with the passage of vessels travelling in opposite directions and the overtaking of one vessel by another travelling in the same direction.

10. Section 2 of the Act, 33 U.S.C. § 1201, states:

"It is the purpose of this Act to provide a positive means whereby the operators of approaching vessels can communicate their intentions to one another through voice radio, located convenient to the operator's navigation station."

A Coast Guard regulation promulgated pursuant to the statute, 33 C.F.R. § 26.04(b), provides:

"Each person who is required to maintain a listening watch under section 5 of the Act [generally, the master or pilot] shall, when necessary, transmit and confirm, on the designated frequency, the intentions of his vessel and any other information necessary for the safe navigation of vessels."

passage of the vessels at about 1108) as a result of that presence, and would have been able to navigate safely into the cut had the Maria Venizelos not been there. The challenge is based on the following argument: (1) the Maria Venizelos grounded at 1110; (2) the Mellon passed the Maria Venizelos *after* that grounding, at 1112; (3) the location of the Mellon's grounding was three-quarters of a mile from where she had passed the Ore Mercury; (4) the Mellon first grounded as it passed the Maria Venizelos; (5) the Mellon and Maria Venizelos therefore grounded at about the same location, which was about three-quarters of a mile from the Ore Mercury; and (6) the Maria Venizelos therefore did not interfere with the Mellon's efforts to turn right after passing the Ore Mercury and to thereby reenter the cut, since any interruptions in that right turn occurred at times when the Maria Venizelos was beyond the Mellon's radar range (as determined by speed and distance computations) and the Mellon therefore was not steering with respect to the Maria Venizelos.

Much of the evidence in this case is in conflict. The incident itself occurred during what the parties have called a "pea soup fog", which made it extremely difficult for the principals to determine the precise location of the vessels at a particular time. The nature of the situation required intricate maneuvers in a short time period so that "[t]ime just seem[ed] to stop" (Linton, N.T. 48), and therefore a precise determination of times also has presented difficulty. To those inherent problems must be added the fact that trial was not held until four years after the event, when memories can be expected to have faded. I have carefully reviewed the evidence in an attempt to reconstruct how this accident occurred and, having done so, am in complete agreement with plaintiffs' observation that "abilities to recollect precise details of times, distances, angles, and maneuvers under [the] circumstances [of this case] are at best suspect" (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Reconsideration, at 6). The expert testimony (which is also conflicting) is based to some

extent on assumptions derived from these recollections, and therefore is not much more helpful. *Cf. The "Statue of Liberty"*, [1971] 2 Lloyd's L.R. 277, 280–81 (H.L.) (opinion of Lord Reid). In light of these problems, I find the Maria Venizelos defendants' analysis, which depends entirely on acceptance of its disputed version of some of these details, unpersuasive..

From the outset, one of the overriding impressions that I received from the testimony of the witnesses personally involved in this incident was that the Maria Venizelos' presence in the cut presented the Mellon with an emergency situation to which she was compelled to react. The testimony on this aspect of the case concerned a major episode in the chronology of events rather than a detail such as distance or time, and I have found that testimony quite reliable. To me, the witnesses' testimony on this matter was so convincing that I must reject any version of the disputed evidence that leads to a contrary conclusion. As are most other details in this case, those relied on by the Maria Venizelos defendants are disputed in the record. Although there is testimony that the Mellon passed the Maria Venizelos after the Maria Venizelos had grounded (Ahrens, N.T. 17–18, 59–60; Archontas Dep. at 32; Tagaris Dep. at 11), there also is testimony leading to a different conclusion (Ahrens, N.T. 13–14; Coast Guard Hearing Tr. (Ahrens) 86–87). The most likely scenario, as set forth in Finding of Fact No. 33, is that the two events occurred at about the same time. It would take about one and one-half minutes for the Mellon to pass the Maria Venizelos, meaning that if the bow started to pass before 1109, the stern wouldn't complete passage until after 1110. I believe that the Maria Venizelos grounded during that interval, and that this explains the statements of her personnel that they saw the Mellon passing after they had grounded. Similarly, there are differences over where the Maria Venizelos' grounding occurred. While some of the evidence can be interpreted, as the Maria Venizelos defendants have done, to place the location of grounding of the Maria Ven-

izelos about three-quarters of a mile above the Ore Mercury, there also is considerable evidence (e. g., Ahrens, N.T. 14–15, 22–23) placing that location further down the channel, much closer to the Ore Mercury. I have adopted the latter view, particularly since it is established by the direct evidence of the Maria Venizelos' own pilot. The details as to time of passage and location of the Maria Venizelos' grounding are keystones of the Maria Venizelos defendants' argument, and, since I have resolved the disputed evidence as to these details against the Maria Venizelos defendants' position, that argument fails.

■ I have carefully reviewed the disputed evidence in attempting to reconstruct, with as much relevant detail as possible, the chronology of this incident. After making this review, I have modified the details in some of my findings, but the general content of the original findings remains unchanged. I have found that the Ore Mercury and the Maria Venizelos each performed acts which were substantial factors leading to the Mellon's grounding. The Ore Mercury's failure to anchor quickly enough, in light of the Mellon's excessive speed, created an emergency situation which forced the Mellon to take evasive maneuvers. The presence of the Maria Venizelos in the cut greatly compounded that emergency, forcing more evasive maneuvers, including the Mellon's interruption of her right turn to control the swinging of her stern. It is a well established principle that a party that creates an emergency is accountable for injury resulting from it. See, e. g., Restatement (Second) of Torts, § 296 & Comment d (1965). Although I have found (Finding of

Fact No. 49) that the Mellon was at fault for failing to extricate herself from the emergency and return to her proper course although she had sufficient time to do so, that finding does not absolve the defendants of all liability. The Mellon's conduct, in light of the disorientation caused by the emergency and the aggravating factor of near-zero visibility, was not so extraordinarily negligent as to be a supervening cause of the grounding. See id. § 447. The defendants therefore must share liability for the damages suffered by the Mellon.

As a result of this motion, I have reevaluated the parties' conduct and made some additional findings with respect to respective fault. See Findings of Fact Nos. 39, 43, 49. I also have reconsidered the relative percentages of fault chargeable to each party. Having reconsidered, however, I have concluded that the percentages set forth in the original findings were correct and should not be changed.

■ In *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1716, 44 L.Ed.2d 251 (1975), the Supreme Court held that liability should "be allocated among the parties proportionately to the comparative degree of their fault." This holding has been interpreted to mean that liability must be measured according to the relative culpability of the parties' actions rather than their respective degrees of physical causation. See, e. g., Alaska Packers Association, Inc. v. O/S East Point, 421 F.Supp. 48, 53 (W.D.Wash.1976); Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co., 402 F.Supp. 1187, 1188 (W.D. Wash.1975), vacated on other grounds, 565 F.2d 1129 (9th Cir. 1978).[11] Translation of

---

11. In adopting the comparative fault rule, the Supreme Court noted that it was following the lead of the world's other major maritime nations and particularly noted the adoption of such a rule by Great Britain in the Maritime Conventions Act, 1911, 1 & 2 Geo. 5, c. 57, § 1. 421 U.S. at 403–04, 95 S.Ct. 1708. The British cases disclose that in assessing comparative fault, the courts of that nation have looked to both the relative culpability, or "blameworthiness," of the parties' faults *and* the relative "causative effect" of each party's acts. See, e. g., The "Statue of Liberty," [1971] 2 Lloyds

L.R. 277, 282 (H.L.); The "Esso Brussels," [1973] 2 Lloyds L.R. 73 (C.A.); The "Salaverry," [1968] 1 Lloyds L.R. 53 (Adm.Div.). This analysis makes sense, for it is difficult to make an abstract analysis of relative culpability without any reference to how that culpability affected the plaintiff's ultimate injury. Of course, the degree of culpability will often have a direct relationship to the degree of causation. See, e. g., The "Salaverry," supra, at 62–63. In such a situation, it will make little difference whether the approach taken by the British cases or that of the recent American cases

this concept into numerical percentages is not a task that can be performed with precision, and, at best, only a reasonable estimate of the comparative figures can be produced. The percentages I have arrived at are my best estimate of comparative fault.

I shall not repeat all of the findings with respect to the faults of each vessel. Findings of Fact Nos. 35–49 explain my assessment of each vessel's conduct. The worst fault was the Mellon's excessive speed. Although she had entered dense fog, she travelled up the Marcus Hook Range at a speed much faster than her bare steerageway. In doing so she violated Article 16 of the Inland Rules of the Road, 33 U.S.C. § 192.[12] *Cities Service Oil Co. v. M/S Melvin H. Baker,* 384 F.2d 911 (3d Cir. 1967) (per curiam). The fault was compounded by the fact that she had been informed that the Ore Mercury would be anchoring ahead of her. Her speed was still too fast when she had to make the intricate emergency maneuvers in the upper part of the range. Many of the Mellon's other faults—particularly the radar use errors—increase in magnitude because of their direct relationship to her excessive speed. Proper use of the radar would have furnished information which should have caused the Mellon to slow down.

Considering the Mellon's errors, the faults of the other two vessels were much less by comparison. The Maria Venizelos' faults were quite serious—especially her entrance of the cut in the face of other much more prudent alternatives[13]—and mandate that she be allotted a significant degree of liability.[14] The Ore Mercury's faults were much less serious and equate to a much smaller degree of overall liability.

After the reevaluation, I am satisfied that the liability ratio of 70:25:5 set forth in Finding of Fact No. 50 is the most accurate apportionment that can be achieved.

B. *Liability for Additional Damage Caused by Ungrounding Efforts*

The decision to hold the Mellon solely liable for the damages totalling $220,000 sustained during ungrounding was fully explained in the January 11, 1978 ruling from the bench, and I abide by that decision now.

(which deemphasize consideration of degree of causation) is used. In the instant case, I have concluded that the relative egregiousness of each ship's conduct places most of the liability for the grounding on the Mellon itself, with a significantly lesser degree to be allotted to the Maria Venizelos and a still smaller amount to the Ore Mercury. In terms of the chain of proximate causation, the facts show that the three ships' faults were progressively further removed from the ultimate event (the grounding) in a proportion roughly equal to the egregiousness of those faults. The Ore Mercury's faults were the most removed from the injury; a number of factors intervened between her anchoring (which forced the Mellon to swing around her) and the grounding. The Maria Venizelos' faults were a greater cause; her presence in the cut compounded an emergency situation which prevented the Mellon from regaining her proper course and caused the Mellon to ground. The Mellon's faults were by far the greatest contributing cause; her excessive speed placed her at the location of the emergency when she shouldn't have been there and curbed her ability to react to the emergency once it arose, and her negligence in failing to return to a proper course after being confronted with the Maria Venizelos was the final fault before the grounding. Using the British analysis, the result in this case is thus the same as that when the American cases are applied. I do not believe application of the British rule alters the percentages I have determined.

12. Article 16 provides:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions."

13. Her entrance of the cut violated the Notices to Mariners, which required that deep draft vessels travelling upriver be given the right of way.

14. In their motion for reconsideration, plaintiffs have argued that one of the faults charged to the Mellon should not have been so charged and that, once this fault is eliminated, the Mellon and Maria Venizelos are in equal fault and should share liability equally because the number of faults charged to each is the same. As plaintiffs concede, however, the faults must be judged by a qualitative, not a quantitative, analysis. *Pan-Alaska Fisheries, supra,* 402 F.Supp. at 1188. Applying this analysis, I agree that the Maria Venizelos should share a significant amount of the liability, but certainly not as much as the Mellon.

Plaintiffs phrase the legal question as whether the Mellon's ungrounding efforts were so palpably negligent as to be a supervening cause of the additional damage, one beyond the range of defendants' foreseeability. *See, e. g., The Algonquin,* 70 F.2d 335 (2d Cir. 1934); Restatement (Second) of Torts § 447 (1965). For evidence satisfying this standard, one need look no further than the testimony of the salvage engineer, Captain William F. Searle, Jr., that the Mellon's post-grounding engine maneuvers were "blatantly imprudent." As I stated in the ruling from the bench, I find incomprehensible the extended full ahead orders given after the stern had grounded. In my view, the Mellon's ungrounding efforts were so negligent that defendants should not be charged with the resulting additional damage. The holding on this issue will not be altered.

*Conclusions of Law*

1. This matter is within the admiralty and maritime jurisdiction of this Court pursuant to 28 U.S.C. § 1333.

■ 2. The following instances of negligent navigation of the S/S William L. Mellon contributed to her grounding:

(a) she was operated at excessive speed (a violation of Article 16 of the Inland Rules of the Road, 33 U.S.C. § 192);

(b) she failed to make adequate use of her radar in measuring speed;

(c) she failed to make adequate use of her radar in determining the positions of the Ore Mercury and the Maria Venizelos;

(d) she failed to make a timely agreement with the Ore Mercury before passing the Ore Mercury (a violation of the Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. §§ 1201–1208, and regulations promulgated thereunder);

(e) she failed to make a timely agreement with the Maria Venizelos prior to the meeting of the two vessels in the cut (a violation of the Radiotelephone Act, *supra,* and the Notices to Mariners);

(f) she failed to make known her objection to the Maria Venizelos' entrance to the cut after the intention to make such an entrance was announced (a violation of the Radiotelephone Act, *supra* );  and

(g) she failed to return to her proper course after meeting the Maria Venizelos.

■ 3. The following instances of negligent navigation of the S/T Maria Venizelos contributed to the Mellon's grounding:

(a) she left her berth at Paulsboro, New Jersey, without ascertaining the weather and visibility conditions downriver;

(b) she was operated at excessive speed (a violation of Article 16, *supra* );

(c) she failed to make adequate use of her radar in determining the positions of the Ore Mercury and the Mellon;

(d) she failed to make a timely agreement with the Mellon prior to the meeting of the two vessels in the cut (a violation of the Radiotelephone Act, *supra,* and the Notices to Mariners);

(e) she failed to remain above the cut until the Mellon had passed (a violation of the Notices to Mariners);  and

(f) she failed to move out of the cut before her presence required the Mellon to take evasive action to avoid collision.

■ 4. The following instances of negligent navigation of the S/S Ore Mercury contributed to the Mellon's grounding:

(a) she failed to communicate with the Mellon about her anchoring plans before committing herself to the upper space in the Marcus Hook anchorage (a violation of the Radiotelephone Act, *supra* );

(b) she failed to maintain an adequate watch for the Mellon as she anchored;  and

(c) she failed to swing her stern out of the channel quickly enough.

5. The percentages of fault for the Mellon's grounding are:

| | |
|---|---|
| Mellon | 70% |
| Maria Venizelos | 25% |
| Ore Mercury | 5% |

6. The Mellon sustained damages totalling $520,000 as a result of the grounding.

■ 7. The Mellon sustained additional damages totalling $220,000 as a result of her efforts to unground. The Mellon's un-

grounding efforts were so negligent as to be a supervening cause of the additional damages, and the defendants therefore are not liable for that additional amount.

8. Defendants S/T Maria Venizelos, Compagnia Maritima Istmenia, Ltda., Venizelos A.N.E., and Venizelos Shipping (Agencies) Ltd. are liable to plaintiffs in the amount of $130,000, representing 25% of $520,000.

9. Defendants S/S Ore Mercury and Universe Tankships, Inc. are liable to plaintiffs in the amount of $26,000, representing 5% of $520,000.

10. Plaintiffs shall be awarded prejudgment interest at the rate of 6% on the amount of damages assessed against each of the defendants from plaintiffs' date of payment, April 23, 1974.

Because the ultimate conclusions set forth in this opinion do not differ from those rendered from the bench on December 5, 1977 and January 11, 1978, the judgment will not be amended.