**In the Matter of the Complaint of SEIR-IKI KISEN KAISHA and Dragon Navigation, S.A., Plaintiffs, as Owner and Bareboat Chartered Owner, respectively, of the M/V SEIRYU, for Exoneration from or Limitation of Liability.**

**In the Matter of the Complaint of STENA GULF LINE, LIMITED, as Owner, and Stena Line AB, as Disponent Owner of M/V STENA FREIGHTER, seeking Exoneration from or Limitation of Liability.**

Nos. 82 Civ. 2681 (LBS), 82 Civ. 2718 (LBS).

United States District Court, S.D. New York.

Jan. 14, 1986.

Memorandum Endorsement April 7, 1986.

Haight, Gardner, Poor & Havens, New
York City, for Stena Gulf Line Ltd. and

Stena Line AB; Richard G. Ashworth, James T. Shirley, Jr., of counsel.

Healy & Baillie, New York City, for Seiriki Kisen Kaisha and Dragon Navigation, S.A.; Nicholas J. Healy, Richard V. Singleton, of counsel.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for Seiryu Cargo Claimants; Raymond P. Hayden, Sanford E. Balick, of counsel.

Donovan, Maloof, Walsh & Kennedy, New York City, for The Stena Freighter Cargo; James P. Krauzlis, of counsel.

## OPINION

SAND, District Judge.

These consolidated limitation proceedings arise out of the collision occurring on October 29, 1981 between the STENA FREIGHTER which was proceeding from Miami to Panama, and the SEIRYU, which was proceeding from the Panama Canal to Houston, following which the Seiryu sank with substantial loss of property but, fortunately, with no loss of life. The litigation has proceeded in stages, the first of which involved the resolution of the question of whether Cuban law or the Brussels Collision Convention of 1910 was applicable. At the conclusion of a hearing held on June 19, 1985, this Court ruled that Article 4 of the Brussels Convention would govern certain issues as to liability in these proceedings. We annex as Appendix A hereto the oral Opinion of the Court setting forth the reasons for that determination.

The next matters addressed by the Court relate to issues of liability. This Opinion constitutes our findings of fact and conclusions of law on liability issues, including petitions for limitation of liability and cargo claims. Questions relating to damages have been deferred until a later stage of these proceedings.

## FINDINGS OF FACT

### 1. The Parties

Plaintiffs in 82 Civ. 2681, Seiriki Kisen Kaisha ("Seiriki"), a Japanese corporation and Dragon Navigation, S.A. ("Dragon"), a Panamanian corporation, were respectively owner and bareboat charterer of the Seiryu. In the second proceeding, 82 Civ. 2718, Stena Gulf Line, Ltd., ("Stena Gulf") a Cayman Islands corporation, and Stena Line AB ("Stena AB"), a Swedish corporation, were respectively owner and bareboat charterer of the Stena Freighter. Stena Gulf and Stena AB filed claims in the first proceeding for damage to the Stena and Seiriki and Dragon filed claims in the second proceeding for loss of the Seiryu. The owners of Seiryu's cargo on their own behalf and on behalf of their subrogees, filed claims in both proceedings for the cargo loss. However, the Seiryu cargo interests have settled with the Seiryu vessel interests and are now claiming only against the Stena. The owners of the Stena's cargo have filed certain claims for the amount of any contributions they might be required to make toward certain general average expenses said to have been incurred by the Stena following the collision.

Coordinated Caribbean Transport, Inc. ("CCT"), a Florida corporation, was time charterer of the Stena Freighter. Pursuant to a charter party containing an agreement to arbitrate disputes, CCT has withdrawn from this litigation.

### 2. The Vessels

The Stena Freighter was a 5,940 gross ton steel roll-on/roll-off motor vessel built in 1977 of 490.78 feet length and 70–73 feet in beam, registered in the Cayman Islands. The Seiryu was a 17,151 gross ton steel bulk carrier motor vessel built in 1976 of 180.16 meters length and 24.8 meters beam, registered in Japan.

### 3. Navigation and Collision

The parties have stipulated, Amended Pretrial Order at 4–5:

> On October 29, 1981, the "STENA FREIGHTER," proceeding from Miami for Panama, and the "SEIRYU," proceeding from the Panama Canal for Houston, were in collision approximately 8.5 miles off Cape San Antonio at the

westernmost end of Cuba, at 2330 "STE-NA FREIGHTER" time, 2230 "SEIR-YU" time. The weather was clear and the visibility good.

The Seiryu was manned by a Master and crew who were Korean. The Master of the Stena was Canadian and her other officers were British. Depositions were taken of the officers who were aboard the vessel at the time of the collision and these depositions were received in evidence, but the only witnesses to testify at trial were expert witnesses.

The events immediately preceding the collision are in dispute and thus, to some extent, the Court is called upon to render determinations of the credibility of these witnesses. Since the credibility of both watch officers at the time of the collision is substantially impeached by the known documented facts concerning the position and movements of the ships, and since the testimony of these witnesses is to some extent implausible, we reject the version of the collision set forth by the watch officer of each vessel concerning his actions and omissions immediately preceding the collision.

According to the Seiryu witnesses, that vessel, showing proper navigation lights, was proceeding at full sea speed on a northwesterly course south of Cape San Antonio, Cuba. Approximately twelve minutes before the collision, Third Officer Bae, standing the watch, had a contact by radar of another vessel, bearing 75 degrees on the Seiryu's starboard bow at a distance of approximately six miles. With binoculars, he could see the outline of the other vessel, two white lights and, dimly, a red side light. Since the two white lights were open, with the left-hand lower than the right-hand light, Mr. Bae concluded that the other vessel was running parallel to the Seiryu's course. He continued to observe the other vessel and noticed that she was coming nearer to the course of the Seiryu.

The Seiryu interests further contend that approximately five to six minutes prior to the collision, Mr. Bae ordered the quartermaster on watch, who had been serving as look-out while the vessel was on automatic steering, to stand by the wheel. He claims that approximately four to five minutes before the collision, he flashed a warning signal to the other vessel by light. He sought to signal the other vessel by no other means. Receiving no response from the other vessel, which had more rapidly approached the course of the Seiryu, he ordered "hard left rudder" shortly before the collision. The order was executed, but the Stena Freighter crashed into the starboard side of the Seiryu in the area of No. 5 hold.

According to the Stena Freighter's watch officer, she was proceeding on course 204 degrees on automatic pilot with her engines at full ahead, making a speed of 15.6 knots over the ground. A.B. Mr. James Conteh was standing watch as a look-out with Third Officer Richards. At 22:20, Stena time, Richards, having determined her position to be 14.2 miles north of Cape San Antonio light, and to the left of the plotted course line, altered course to 208 degrees to make good a course of 204 degrees true. There were no subsequent changes in the course or speed of the Stena Freighter prior to the collision and the vessel remained on automatic pilot until the collision.

Richards testified at his deposition that he picked up the Seiryu by radar at a distance of more than fifteen miles on the Stena Freighter's port bow. About half an hour before collision, the look-out observed and reported the Seiryu's lights and Richards observed her lights at a distance of about twelve miles. Richards determined that the Seiryu was on a crossing course and that under the International Regulations for Preventing Collisions at Sea 1972 ("72 Col.Regs."), the Stena Freighter was the stand-on vessel and the Seiryu was the give-way vessel. Richards testified that he plotted successive positions of the Seiryu on the radar reflection plotter and concluded that the relative movement line was such that the Seiryu would pass astern of the Stena Freighter. As the vessels closed, Richards increased the range scale on the

Stena Freighter's radar to the six-mile and then to the three-mile range. His continuing plots of the relative movement line showed the closest point of approach would be about a half a mile.

Richards testified at his deposition that he then prepared to signal the Seiryu but as he was picking up the Aldis Lamp he noted a change in the configuration of the Seiryu's masthead lights and saw for the first time her red port side running light. He concluded that the Seiryu had made an alteration of course to starboard to make a safe distance between the vessels, as the Seiryu would pass off the Stena Freighter's port quarter and go astern of the Stena Freighter. Having reached this conclusion, Richards put down the Aldis Lamp and proceeded to occupy himself with navigational duties unrelated to the Seiryu. He took a fix on Cape San Antonio, which was now abaft the beam on the same side of the Stena as the Seiryu. He turned and took a visual bearing on Cape San Antonio. He went to the radar and measured the distance off the light. He then went to the chart table, located in the after part of the Stena Freighter's wheel house, and plotted the position on the chart.

The look-out, Conteh, remained on the bridge as look-out while Richards was at the radar taking the range on Cape San Antonio and until about three minutes before the collision. He requested to go below to call the next watch, which permission Richards granted. After completing the navigational fix, Richards stepped around the chart table and, at that moment, saw the Seiryu dead ahead, proceeding at approximately a right angle across Stena Freighter's bow. Richards testified that he ran and put the controllable pitch propeller levers to STOP as the vessels collided.

If one accepts either of these versions of the events preceding the collision, it would appear that on a clear night with no other vessels or navigational hazards in the area, with a full awareness of the presence of the other vessel, these two ships nevertheless managed to collide at right angles.

The Seiryu does not dispute the fact that it was in violation of the 72 Col.Regs. or, for that matter, any other standard of good seamanship. It is undisputed that the Seiryu was the give-way vessel and failed to take timely action appropriate for a give-way vessel. The Seiryu's watch officer failed to determine the risk of collision, visually by radar or otherwise, and somehow reached the entirely erroneous conclusion that the Stena Freighter was on a parallel course. The Seiryu's watch officer failed to give the appropriate signals when the Seiryu altered course and most significantly failed to appropriately signal when she turned to port two or three minutes before the collision. This latter failure was of particular importance because the Stena Freighter's watch officer was not observing the vessel at this point, but, rather, plotting his fix on the chart.

Of course, the most immediate cause of the collision was the Seiryu's turn to port, which brought her directly across the course line of the Stena Freighter. There is no way this can be explained and, indeed, the watch officer and other officers aboard the vessel could not offer any rational explanation; their only commentary was that the watch officer must have been possessed by demons or evil spirits.

■ Although it fully admits its responsibility for the collision, the Seiryu maintains that the Stena also was at fault. It is the Seiryu's claim that at the critical times prior to the collision, no one on the Stena was observing the Seiryu and thus, no one was in a position to take avoiding action required by the Col.Regs. Col.Regs. Rule 5 requires that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." It would appear that while proceeding at full speed and on automatic pilot, the watch officer permitted the look-out to summon the succeeding watch and occupied himself with navigational tasks that were not of an urgent nature. Thus, at the

time of the collision, and in the moments immediately prior to the collision, there was no one aboard the Stena watching the Seiryu. Richards' explanation that he abandoned his intent to signal the Seiryu when he saw that the approaching vessel's running lights indicated a safe course change is not credible. But, even if accepted, it would not justify total abandonment of the bridge and look-out insofar as observation of the Seiryu was concerned. When two vessels are that close, constant observation is required, even though it may appear that the vessels are on a safe crossing course. There is, for example, no assurance that the give-way vessel may not experience some casualty, most critically, a steering casualty, that would suddenly create a condition of danger.

The Stena's principal response to these contentions emphasizes its inability to avoid the collision, even while maintaining a diligent lookout, rather than attempting to justify the failure to constantly observe the Seiryu during the moments prior to the collision. In essence, it is the Stena's position that as the stand-on vessel, prudent seamanship and the Regulations required maintenance of course and speed and that any last moment alterations in this regard might have exacerbated rather than alleviated the danger of collision.

▌ However, the Stena could have done something if there had been a fuller appreciation of what was occurring. For instance, the Stena could have signaled the Seiryu not merely with the Aldis Lamp, Richards' alleged intent, but with a warning signal of at least five short rapid whistle blasts. Had such a signal been sounded, and had there been no reaction from the Seiryu, the Stena would have known that the Seiryu was a vessel which could not be relied upon to operate in accordance with the dictates of good seamanship. As we have already indicated, we take with a large grain of salt the deposition testimony of both watch officers concerning their awareness and observation of the other vessels. (It appears that Richards did make some notes immediately after the

collision but these notes were not retained.) It is the Court's view that each vessel was essentially pursuing its own independent course intentions without an awareness of the other vessel. And, if this was the case, wholly or partially, the failure of the Stena to ensure by sound signals that the Seiryu was aware of its presence is a significant factor in the occurrence of the collision.

The Seiryu argues that the Stena, although a stand-on vessel, was permitted under Col.Regs. Rule 17(a)(ii) to "take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules." Moreover, pursuant to Col.Regs. Rule 17(b) "[w]hen, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she *shall* take such action as will best aid to avoid collision." (emphasis added).

The Seiryu, pointing to the Stena's high maneuverability (having twin screws and variable pitch propellers), suggests various maneuvers which the Stena could have taken had the Seiryu not reacted to a warning signal. Thus, the Seiryu suggests that Richards could have stopped the vessel dead in the water in two or three minutes, and that even in the last minutes before collision would otherwise have occurred, he could have turned his vessel sufficiently to pass astern of the Seiryu. The Stena indicated that any of these maneuvers might have been imprudent if they had been countered by the Seiryu's off-setting maneuvers. However, if there had been no response by the Seiryu to the Stena's warning signal, the Stena would then have known that the vessel bearing down upon it was one which was not likely to act with an awareness of the Stena's presence. It is for this reason that in determining that the Stena bears a degree of responsibility for the collision, we place primary emphasis on its failure to give a whistle warning signal

rather than its failure to make any specific maneuver.

## CONCLUSIONS OF LAW AS TO NAVIGATION

 We conclude, as the Seiryu concedes, that its failure as the give-way vessel to alter its course and speed so as to avoid collision with the Stena was a violation of the Col.Regs. and was a substantial contributing factor to the collision. We also conclude that the failure of the Stena to maintain a proper look-out prior to the collision by having both the look-out and the watch officer engaged in other activities, although allegedly aware of the proximity of the Seiryu, was a violation of the Col.Regs. Also, the Stena's failure to give a warning signal was a contributing cause to the collision.

 Pursuant to Article 4 of the Brussels Collision Liability Convention of 1910,[1] this Court now faces the more difficult task of assigning percentages of fault to the two vessels. Article 4 provides in relevant part that:

"If two or more vessels are in fault the liability of each vessel shall be in proportion to the degree of the faults respec-. tively committed. Provided that if, having regard to the circumstances, it is not possible to establish the degree of the respective faults, or if it appears that the faults are equal, the liability shall be apportioned equally."

Great Britain, one of the countries that either has ratified or adheres to the Brussels Convention, *see United States v. Reliable Transfer Co.*, 421 U.S. 397, 404 n. 7, 95 S.Ct. 1708, 1712 n. 7, 44 L.Ed.2d 251 (1975), assesses comparative fault by "look[ing] to both the relative culpability, or 'blameworthiness,' of the parties' faults *and* the relative 'causative effect' of each party's acts."[2] *Afran Transport Co. v. S/T Maria Venizelos*, 450 F.Supp. 621, 636 n. 11 (E.D.Pa.1978) (*citing The "Statue of Liberty"*, [1971] 2 Lloyd's L.R. 277, 282 (H.L.); *The "Esso Brussels"*, [1973] 2 Lloyd's L.R. 73 (C.A.); *The "Salaverry"*, [1968] 1 Lloyd's L.R. 53 (Adm.Div.)) (emphasis in original).[3] While the Stena maintains that it should bear no liability for the colli-

1. *See* Appendix A.

2. The British passed the Maritime Conventions Act of 1911 to carry into effect the Convention of 1910. Brandon, *Apportionment of Liability in British Courts under the Maritime Conventions Act of 1911,* 51 Tulane L.Rev. 1025, 1026 (1977). The Act is considered wider in scope than the Convention in only two respects, neither of which impact upon the comparative fault provisions at issue in the instant case. *See id.* at 1027–28. Therefore, this Court is of the opinion that Britain's determination that both culpability and causative potency of faults are to be regarded in apportioning liability, *id.* at 1031–32, applies to all apportionments of liability governed by the Brussels Convention.

3. In *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the United States Supreme Court replaced the admiralty rule of divided damages by a rule requiring liability for such damage to be allocated among the parties proportionately to the comparative degree of their fault, and to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault. American courts have interpreted this holding to require the assessment of "liability according to the relative culpability of the par-

ties' actions rather than their respective degrees of physical causation." *Afran Transport Co., supra,* 450 F.Supp. at 636. *See also Cumberland County Utilities Authority v. The M/T Delbar,* 1984 A.M.C. 1856, 1865 (D.N.J. Jan. 27, 1984); *Alaska Packers Ass'n, v. O/S East Point,* 421 F.Supp. 48, 53 (W.D.Wash.1976); *Linehan v. United States Lines, Inc.,* 417 F.Supp. 678, 689 n. 17 (D.Del.1976); *Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.,* 402 F.Supp. 1187, 1188 (W.D.Wash.), *vacated on other grounds,* 565 F.2d 1129 (9th Cir.1978). In the instant case, however, the Brussels Convention is applicable, and it warrants consideration of both culpability and causation in Article 4 determinations. *See* text accompanying note 2 *supra.*

It should be noted that "the degree of culpability will often have a direct relationship to the degree of causation," *Afran Transport Co., supra,* 450 F.Supp. at 636 n. 11, and that, in such cases, "it will make little difference whether the approach taken by the British cases or that of the recent American cases ... is used." *Id.* at 636 n. 11. Moreover, at least one court has noted that the analysis utilized by the British "makes sense, [since] it is difficult to make an abstract analysis of relative culpability without any reference to how that culpability affected the plaintiff's ultimate injury." *Id.*

sion,[4] the Seiryu's position is that the two vessels should bear equal liability because either the faults were in fact equal or it is not possible to fairly establish the appropriate percentages. *See* Brussels Convention Article 4, *supra.*

This Court is of the opinion that while mathematical allocation is not an easy task, the circumstances of the instant case do not preclude a fair assessment of liability.[5] Moreover, it is of the opinion that the respective faults of the two vessels are not equal. The Stena's actions certainly do not

warrant its exoneration from all liability. *See* text at 1380–1381 *supra.* However, this Court must conclude that greater fault lies with the Seiryu in terms of both culpability and causation because of its status as a give-way vessel and, most importantly, its inexplicable last minute course alteration. This ultimate maneuver guaranteed that the two vessels would collide in the manner they did with the attendant consequences.[6] This Court therefore determines that a fair allocation of responsibility for the collision is 60% attributable to the Seiryu and 40% attributable to the Stena.[7]

**4.** The Stena alternatively proposes that its share of contributory fault for damages resulting from the collision is no more than 10% and that the Seiryu's post-collision actions constituted an intervening fault limiting the Stena's liability to 10% of the damage sustained by the Seiryu as a result of the collision and 2½% of the damage sustained by the Seiryu because of the sinking. Stena's Proposed Findings of Fact and Conclusions of Law at 58; 61; 68–69.

**5.** This Court is not in a position where "it is unable to determine on any rational basis the proportionate degrees of fault." *Bremmer v. Shedd,* 467 F.Supp. 261, 268 (W.D.Pa.1979).

**6.** The Seiryu was the give-way vessel and, as such, had a duty to alter its course and speed so as to avoid the collision. 72 Col.Regs. Rule 15. While this does not entirely absolve the Stena from fault where that vessel failed to maintain a proper lookout and did not take any precautionary measures, *see* 72 Col.Regs. Rules 17 and 34, the Seiryu's inexplicable hard port turn ultimately shaped the intensity and locus of the impact. While the collision certainly would have occurred even without the Seiryu's inexplicable final turn, it would not have been a right angle collision with the Stena's bow penetrating the middle of the Seiryu's No. 5 hold to a depth equal to approximately half the breadth of the Seiryu. The only type of collision that would have provided worse consequences than that which occurred is a bow-to-bow collision, one which the vessel's positions never intimated.

**7.** The Seiryu interests argue that the instant case is similar to others where courts have apportioned equal liability due to each vessel's failure to maintain a lookout. *See* Trial Memorandum of Seiriki Kisen Kaisha and Dragon Navigation, S.A. at 64–67; Claimants' Okura & Co., Ltd., et al. Second and Principal Trial Memorandum of Law at 37–50. However, this Court is of the opinion that the Seiryu's inexplicable shift of course at the last moment, when the vessels were less than half a mile apart (*see* Trial Tran-

script at 127–28), warrants other than equally proportionate liability. *Compare* instant case *with Granholm v. TFL Express,* 576 F.Supp. 435 (S.D.N.Y.1983) (plaintiff only recovered one-half its provable damages where both parties failed to maintain proper lookout; neither vessel altered course prior to sudden awareness of pending collision and there was no suggestion that give-way vessel was unable to fulfill duty of avoiding stand-on if latter was displaying proper sternlight); *Shaun Fisheries, Inc. Limitation Proceedings,* 1984 A.M.C. 2650 (D.Ore. Sept. 21, 1983) (court rejected contention that stand-on vessel should be held totally responsible for collision where found that stand-on did not suddenly swerve to starboard after passing abeam of give-way but, rather, continued on original course until collision).

Even British cases that have apportioned equal liability reflect different pre-collision activities. *See The "Toni"* (1973) 1 Lloyd's L.R. 79 (both vessels had altered course in wrong directions, give-way having turned to port instead of starboard and stand-on having made series of course changes when it should have maintained same course and speed); *The "Tojo Maru"* (1968) 1 Lloyd's L.R. 365 (both vessels failed to maintain proper lookouts, the major fault on both sides in bringing about the collision; stand-on altered course after sounding warning signals six minutes before collision when vessels were one mile apart, but court viewed this as "all really part of the bad look-out of which [it] had found both vessels guilty").

The Stena's contention that its share of contributory fault, if any, was no more than 10%, substantially rests on cases where vessels have failed to react to another vessel's negligence. *See* Stena's Proposed Findings of Fact and Conclusions of Law at 55–58 (citing, e.g., *Labrador Steamship Co. Ltd. v. M V Eagle,* 1971 A.M.C. 2344 (N.D.Ohio 1971); *The "Miraflores" and The "Abadesa",* (1967) 1 Lloyd's L.R. 191)). As already noted, however, this Court places primary emphasis on the Stena's failure to signal rather than on any maneuvers the Stena could have made after the Seiryu's unexpected turn. *See* text at 1381–82 *supra.* The Stena also relies on

## CONCLUSIONS OF LAW AS TO INTERVENING FAULT

The Stena argues that the failure of the Seiryu's crew to activate the vessel's pumps and their "abandonment" of the vessel in a state of panic without attempting to save it should act as an intervening fault breaking the chain of causation between the collision and the sinking of the Seiryu, thereby relieving the Stena of any share of liability for the damage resulting from the latter. In the alternative, the Stena contends that "[t]he gross negligence of the Seiryu's Master and Chief Engineer in allowing the Seiryu to sink increases Seiriki/Dragon's share of the responsibility for damages resulting from the sinking."[8] Stena Freighter's Proposed Findings of Fact and Conclusions of Law at 66.

It is undisputed that the collision opened the starboard side of the Seiryu's No. 5 cargo hold. The Seiryu's Master, Captain No, decided to abandon the Seiryu approximately thirty minutes after the collision after receiving reports that the engine room was flooding at a rate that well exceeded the pumping capacity of the vessel. Proposed Findings of Fact and Conclusions of Law of Seiriki Kisen Kaisha and Dragon Navigation, S.A., at 18. The parties are in dispute on a number of issues regarding this decision to abandon ship: when did the flooding begin and what amount, if any, was caused by the Stena's attempts to free itself fifteen minutes after the collision; could the pumps have been activated and, if activated, could they have kept the engine room dry; would the Seiryu have sunk regardless of a dry engine room due to the existence of sagging stresses in its deck; did Captain No properly rely on reports from his engineers and was his own knowledge of the Seiryu's pumping mechanisms accurate.[9]

 As one court has noted, "[t]here is authority for the proposition that plain and inexcusable failure, on the part of those in charge of a vessel stricken in a collision, to take available steps to prevent further damage, may, under some circumstances, exonerate another vessel, originally at fault, from liability for the additional damage." *Federal Insurance Co. v. S.S. Royalton*, 328 F.2d 515, 517 (6th Cir.1964) (citing *The Baltimore*, 75 U.S. (Wall) 377, 387, 19 L.Ed. 463 (1869); *The Asbury Park*, 147 F. 194 (2d Cir.1906); *The Redwood*, 81 F.2d 680 (9th Cir.1936)). However, there also is a presumption that a vessel that sinks in the aftermath of a collision has done so as a result of that collision, and the lost vessel does not bear the burden of proving due care or diligence in such circumstances. *The Walter A. Luckenbach*, 14 F.2d 100, 103 (9th Cir.1926) (quoting *The Mellona*, 3 W.Rob. 7); *See also City of Macon*, 121 F. 686, 690 (2d Cir.1903), (collision was the natural and obvious cause for all the subsequent disasters and therefore sufficient to account for all). Thus, a "heavy burden" is cast on the party seeking exoneration for this additional damage. *See Federal Ins. Co., supra*, 328 F.2d 515, 517 (6th Cir.1964). That party "must show an intervening act of negligence so extravagant and unusual, and in such disregard of every rule of prudence, as to go beyond the horizon of ordinary foresight." *The Algonquin*, 70 F.2d 335, 336–37 (2d Cir. 1934).

The Stena's efforts to satisfy this burden rest on its contention that the Seiryu's Master and Chief Engineer grossly underestimated the ability of the Seiryu's pumps to keep the engine room dry and completely abdicated their responsibility to attempt to save their vessel. Stena's Proposed Findings of Fact and Conclusions of Law at 19. At trial, the Stena called a marine surveyor and salvage consultant, Captain Henry C. Halboth, who testified that, in his

---

*In re Flota Mercante Grancolombiana*, 440 F.Supp. 704, 726 (S.D.N.Y.), but in *Flota*, the vessel held 82.5% responsible had faulty equipment and the court mentioned nothing about the other vessel's success or failure at taking precautionary measures.

8. *See* note 13 *infra*.

9. *See* note 12 *infra*.

opinion, it was improper procedure not to attempt to activate the pumps, that the sinking could have been prevented by the Seiryu's pumps, and that in similar collisions, vessels had not broken apart. Trial Transcript at 353; 369; 378. He also testified that, subsequent to the pumping, the vessels could have been detached from one another and the Seiryu towed by the Coast Guard vessel, The Valiant, to a salvor with a good reputation in Cuba. *Id.* at 376–78. *See also* Stena's Proposed Findings of Fact and Conclusions of Law at 19.

■ This Court cannot utilize the "piercing searchlight of hindsight," *China Union Lines, Ltd. v. A.O. Andersen & Co.,* 364 F.2d 769, 779 (5th Cir.), *cert. denied,* 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967), to pass judgment on a decision made *in extremis* by the Seiryu's officers and crew, particularly its Master, Captain No. *See The Walter A. Luckenbach, supra,* 14 F.2d at 102–03; *Federal Ins. Co. v. S.S. Royalton, supra,* 328 F.2d at 517–18. A vessel's Master bears the responsibility of remaining level-headed in times of crisis. *See id.* However, his is the experience of the first hand observer whose knowledge of the facts should be second-guessed only with good reason. *See In re Socony Vacuum Transp. Co.,* 93 F.Supp. 718, 736–37 (S.D.N.Y.1950). He also bears responsibility for taking every necessary precaution, a task that cannot be borne lightly.

It is with these principles in mind that this Court must reject the Stena's contention that its liability should be limited to damages related solely to the collision. Captain Halboth's testimony is conjectural, at best, and based on an analysis lacking in certain parameters. For example, he did not study the nature or extent of the impalement of the Stena into the Seiryu and made his calculations without regard to the Stena's lifting moments. Trial Transcript at 504; 530.[10] However, even if his opinion was the result of a careful and thorough

analysis, it was formed during "calm and unhurried contemplation," *Federal Ins. Co.,* 328 F.2d at 518, rather than during moments of immediate, unparalleled concern for the safety of human lives.

■ Captain No had had a twenty year career in the Korean Navy, where he had received training in damage control, and had been sailing as a Master since 1973. Hyeon No Dep. II (July 12–13, 1983) at pp. 6–17. He had never been involved in a collision before and had served as Master of the Seiryu for a year prior to the October 1981 accident. *Id.* at 1–19; Hyeon No Dep. I (Nov. 3, 1981) at 6. His decision (after observing the structural damage to the ship from its deck, Hyeon No Dep. II 78–79) to remain on the bridge and to rely on reports he had ordered from his officers regarding the quantity of water entering the engine room as well as other information, was sound and proper. Hyeon No Dep. II at 78; 111; *see also* Hyeon No Dep. I at 74–75. In fact, it would have been imprudent for him to leave the bridge to personally check on things at this point in time. *See In re Bloomfield Steamship Co.,* 298 F.Supp. 1239, 1247 (S.D.N.Y.), *aff'd,* 422 F.2d 728 (2d Cir.1970).

As Captain No emphasized, the decision to activate or not to activate the pumps had to be made by his engineers instantaneously. *See* Hyeon No Dep. II at 110. Similarly, the decision to abandon ship had to be made before it was too late to save human lives. Captain No was as, if not more, concerned with the possibility that the Seiryu would break apart, a possibility that at least one expert saw as overwhelming and even more apt to occur if the engine room had been kept dry. *See* Trial Exh. 84 at 18–20 (Final Report Regarding Sinking of Seiryu, J.D. Van Rynbach & Associates, Inc.). This same expert, Mr. J.D. Van Rynbach, a naval architect, also found the rate of flooding into the engine room to be

---

10. Captain Halboth also acknowledged the accelerating dynamic effect of release (*i.e.,* the Seiryu's tendency to go down once the Stena released itself) and the possibility that a disengagement of the Stena could have opened up further compartments in the Seiryu. *Id.* at 508; 551–52. He had not given thought to the problem of the Seiryu's steel cargo and what could have been done with it, if anything, during salvage efforts. *Id.* at 495–96; 510–12.

much greater than Halboth had calculated.[11] He likewise indicated it would have taken thirty minutes to activate the Seiryu's pumps and that this would have been a futile exercise because the vessel was doomed. *Id.* at 613–18; 625.

■ All of these factors lead this Court to conclude that whatever, if any, errors were made in the decision to abandon the Seiryu, they were "error[s] of judgment only, such as any competent [Master] might have committed under the like circumstances." *The Walter A. Luckenbach, supra,* 14 F.2d at 103; *see also The Algonquin,* 70 F.2d 335, 337 (2d Cir.1934). No

11. Mr. Van Rynbach explained the differences in these calculations as based upon his factoring in the Seiryu's slight list after the collision and the fact that the initial flow consisted of a mixture of water and air. Trial Transcript at 608–10. *See also* Trial Exh. 84 (Final Report Regarding the Sinking of the Seiryu, J.D. Van Rynbach & Associates Inc.).

12. This Court must emphasize that it is not ruling out the possibility that the Seiryu could have been saved and that its crew and officers were inaccurate in their seawater flowage calculations and their pumping capacity estimates. However, we need not rule out this possibility in order to reach the conclusion that this conduct was neither "flagrantly improper" nor an intervening cause of the Seiryu's sinking.

This Court's determination that the decisions were not clearly erroneous derives from its assessment of what it considers reasonable and foreseeable behavior at this crucial moment on the part of the Seiryu's officers and crew. One party even has suggested that the Stena's attempts to set itself free fifteen minutes after the collision, without notifying the Seiryu or evaluating the status of the vessels, is what should be labeled an intervening fault. *See* Claimants Okura & Co., Ltd. Second and Principal Trial Memorandum at 75–78. This behavior has been characterized as unseamanlike. Trial Transcript at 489. However, it mirrored the same concern evident in the Seiryu's choice to abandon ship for fear that it would either sink or break apart due to stresses infiltrating its structure. Unfortunately, instincts on both sides were confirmed when the Seiryu sank seconds after the detachment was accomplished. *See* White Dep. at 23.

13. Because this Court concludes that the Seiryu's officers and crew were not grossly negligent in their post-collision actions or inactions, it need not address the Stena's alternative proposal that it increase the Seiriki/Dragon's share of responsibility for the damages resulting from

decisions were "illy considered" or "plainly wrong,"[12] *The Walter A. Luckenbach,* 14 F.2d at 103, and the results justifiably may be characterized as foreseeable consequences of that navigational fault for which the Stena has been deemed liable.[13] *See Oaksmith v. The Mayflower,* 13 Alaska 157, 94 F.Supp. 574, 576–77, *aff'd sub nom. Oaksmith v. Garner,* 14 Alaska 309, 205 F.2d 262 (9th Cir.1953).[14]

## CONCLUSIONS OF LAW AS TO LIMITATION OF LIABILITY

■ Both the Stena and the Seiryu interests[15] have petitioned this Court for

the sinking. *See* text accompanying note 8 *supra. See also The Calliope,* (1970) 1 Lloyd's L.R. 84 (grounding of vessel viewed as caused partly by the faults of both vessels which led to the collision and partly by further fault grounded vessel had committed during a post-collision maneuver).

14. *See also In re Bloomfield Steamship Co.,* 298 F.Supp. 1239, 1245–48 (S.D.N.Y.), *aff'd,* 422 F.2d 728 (2d Cir.1970); *In re Socony Vacuum Transp. Co.,* 93 F.Supp. 718, 736–37 (S.D.N.Y.1950); *The Effra* (1936) 55 Lloyd's L.R. 361 (Adm.Div.). *Compare* these and instant case *with Sinram v. Penn. R.R. Co.,* 61 F.2d 767, 769 (2d Cir.1932); *The Mars,* 9 F.2d 183 (S.D.N.Y.1917).

The Stena also asserts that one British case, *The Thuringia,* where the British Admiralty court held that the sinking of an injured vessel was not proximately caused by the collision, contains facts and circumstances that are "strikingly parallel." Stena's Proposed Findings of Fact and Conclusions of Law at 62–63. However, one of the factors of "great importance to [*The Thuringia* court's] decision" was the condition in which the engines were left when the vessel was finally abandoned, a condition that "might have led to the boilers very soon exploding." 1 Asp.M.C. 283, 288 (1872). Moreover, that court was certain the crew could have stopped the leak and the injured vessel could have been taken to a port for necessary repairs. *See id.* Finally, that vessel's captain received *no* reports regarding the seawater flowage or the pumping capacities and had no fears that the vessel would break apart. *Id.* at 287. This last concern would have been enough to preclude this Court from concluding on the facts herein that "nothing ... [c]ould have induced a master of 'ordinary skill and resolution' to abandon the vessel." *Id.* at 287.

15. The owners and bareboat charterers of each of the vessels are corporate entities. *See* text at

limitation of liability pursuant to The Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 181 *et seq.* (1958).[16] Section 183(a) provides that

> "The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss or destruction by any person of any property, goods or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or foreiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

46 U.S.C. § 183(a) (1958). Section 186 further provides that the charterer may be deemed the owner of the vessel for those provisions relating to liability and its limitation. 46 U.S.C. § 186 (1958).

The Seiryu interests contend that they are entitled to limit their own liability because the collision was not caused with their "privity or knowledge." They maintain that the Seiryu experienced no mechanical difficulties, no corporate officer or managerial employee was aboard the vessel, and the navigational faults were solely those of the Seiryu's watch officer, Third Officer Bae. Trial Memorandum of Seiriki Kisen Kaisha and Dragon Navigation, S.A.

at 60. They further contend that Bae was a competent, licensed ship officer with ample training and experience and that his negligence on this one occasion does not warrant a finding of "privity and knowledge." *Id.* at 60–62.

The Stena interests argue that Seiriki Kisen Kaisha and Dragon Navigation, S.A., were one and the same entity and that Seiriki/Dragon delegated all responsibility to its managing agent, Yukiteru.[17] They further contend that since Yukiteru was on notice that Bae was incompetent, Seiriki/Dragon is not entitled to limit liability. *See* Stena Freighter's Proposed Findings of Fact and Conclusions of Law at 41–46.

The Stena interests argue that they are entitled to limit their liability because the Stena Freighter was in all respects seaworthy as to her manning. *Id.* at 59. Moreover, they claim that the Stena was not privy to Richards' decision to discontinue observation of the Seiryu. *Id.* at 60. The Seiryu interests maintain that the Stena should be charged with their managing agent's (Triport Ferries) knowledge of the Stena's practice of allowing the lookout to abandon his station and go below to check the engine room and call the next watch. Proposed Findings of Fact and Conclusions of Law of Seiriki Kisen Kaisha and Dragon Navigation, S.A. at 32–33.

1377 *supra.* Corporate shipowners and charterers are governed by the same standard of privity as individual owners and charterers, except that only certain corporate officials are chargeable with corporate knowledge. Volk & Cobbs, *Limitation of Liability,* 51 Tulane L.Rev. 953, 956 (1977). *See also* G. Gilmore & C.L. Black, *The Law of Admiralty* § 10–24 (2d ed. 1975); text at 1386–87 *infra.*

**16.** In *The Titanic,* 233 U.S. 718, 34 S.Ct. 754, 58 L.Ed. 1171 (1914), the Supreme Court determined that since in the United States, limitation of a shipowner's liability is considered remedial in nature, it is governed by the law of the forum. Thus, irrespective of the law that creates the underlying liability, which, in this case, is the Brussels Convention of 1910, 46 U.S.C. § 183 governs limitation of liability. *See also* Volk & Cobbs, *supra* note 15, at 981.

The rule announced in *The Titanic* has been somewhat muddied by the Supreme Court's de-

cision in *Black Diamond Steamship Corp. v. Stewart & Sons,* 336 U.S. 386, 69 S.Ct. 622, 93 L.Ed. 754 (1949) (where foreign country in whose territorial waters the casualty occurs attaches limitation to the right of recovery, it is considered substantive rather than procedural). In the instant case, the Court need not engage in a colloquy regarding *Black Diamond,* which has "opened the door to illogical and inconsistent decisions," (Volk & Cobbs, *supra* note 15, at 982), because no party disputes the appropriateness of deciding the limitation issue pursuant to 46 U.S.C. § 183 *et seq. See* Trial Memorandum of Seiriki Kisen Kaisha and Dragon Navigation, S.A. at 44–45; Claimants Okura & Co., Ltd., et al. Proposed Conclusions of Law at ¶ 18–21; Stena Freighter's Proposed Findings of Fact and Conclusions of Law at 60–61.

**17.** See text at 1389 *infra.*

In the context of a corporation, " 'privity and knowledge' means the privity and knowledge of a managing agent, officer, or supervising employee, including supervisory shoreside personnel." *In re Hercules Carriers*, 566 F.Supp. 962, 977 (D.Fla.1983).[18] *See also In re Delphinus Maritima, S.A.*, 523 F.Supp. 583, 594 (S.D. N.Y.1981). As the Supreme Court noted in *Coryell v. Phipps*, 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943), the burden of establishing a lack of "privity or knowledge" under 46 U.S.C. § 183(a) is on those who seek its benefit. Any loss caused by reason of fault or neglect with respect to providing a competent master and crew and seeing that the ship is seaworthy is considered within said privity. *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155 (2d Cir.), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). Seaworthiness generally means that the vessel is "staunch, strong, well-equipped for the intended voyage and manned by a competent and skillful master of sound judgment and discretion." *Id.* (citations omitted).

This Court concludes that the Stena interests have sustained their burden of proof with regard to their own limitation of liability. No mechanical or structural defect or deficiency in the Stena contributed to the collision. *See* Amended Pre-Trial Order at 5. Moreover, its Master and crew had the requisite educational and experiential credentials for their respective positions. Captain Paton, the Master, had sailed as a Master on various ships since 1976 and was highly recommended. MacLeod Dep. at 13. When he was hired, he was explicitly instructed as to the safety of the vessel, crew, and passengers and the importance of complying at all times with the Col.Regs. *Id.* at 19–20. Third Officer Richards, the only crew member of the Stena whose competence truly is contested, had a valid British Grade 3 deck officer's license which qualified him to serve as second officer on foreign vessels such as the Stena. Richards Dep. at 10. Moreover, he had been hired pursuant to inquiries evidencing his worthiness and good potential and was considered a particularly good candidate for advancement. MacLeod Dep. at 22–32.[19]

Captain Paton testified at his deposition that the Stena's managing agents and owners were aware of the Stena's watch practices—*i.e.*, having the AB on watch go down and inspect the engine room. Paton Dep. at 61. He also indicated that they "probably" knew that the AB on watch went down to wake up the crew for the next watch. *Id.* at 61–62. Even if such testimony establishes privity or knowledge of these practices in normal circumstances, it provides no basis for concluding that they were privy to the continuance of such practices at the threshold of danger.[20]

---

18. *See* note 15 *supra*.

19. As noted in *In re Hercules Carriers, Inc.*, 566 F.Supp. 962, 981 (M.D.Fla.1983), "[t]he mere fact that a vessel owner gives instructions to its crew is insufficient to prove the lack of privity and knowledge since a shipowner has a duty to insure that its directives are being followed by making inspection and inquiry." (citing *Spencer Kellogg & Sons v. Hicks*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), etc.). The Stena's owner and bareboat charterer, through the Stena's manning agent, Triport Ferries, did follow up on orders by conducting periodic inspections of the Stena. *See* MacLeod Dep. at 19–20, 46–47, 54–56; Brydon Dep. at 18–19; Stewart Dep. at 10, 14. Moreover, fitness reports on officers were submitted by the vessel's master after each tour of duty, which averaged in duration from one to four months. *See* Brydon Dep. at 23–24;

*see also* MacLeod Dep., Exhs. 1, 3, 9. The Stena Freighter's managers also supplied the vessel with documents relating to navigational safety. MacLeod Dep. at 45–46 & Exhs. 5 & 6.

20. The Seiryu cargo claimants maintain that the presence on board of the Stena's managers (Tri-Port Ferries) on numerous occasions likewise indicates "privity and knowledge" of the Stena's watch practices. Claimants' Okura & Co., Ltd., et al., Second and Principal Trial Memorandum of Law at 58. Notwithstanding this Court's primary conclusion that the cited testimony does not evidence "privity and knowledge" of such watch practices at critical moments, it also is significant that "mere presence on board of an owner of a vessel does not constitute such privity as w[ould] preclude limitation of an owner's liability for a collision." *In re Interstate Towing Co.*, 717 F.2d 752, 754 (2d Cir.1983).

Two experts testified at trial that under today's manning standards, there is discretion as to whether to post a lookout on a ship in the open ocean. *See* Trial Transcript at 67–68; 235. Thus, allowing the watch to check the engine room for five to eight minute intervals (*see* Conteh Dep. at 7) or to summon his replacement, is considered, under normal circumstances, sound practice. *See id.*[21]

The very fact that the look-out asked permission before he went down is a strong indication that the Stena's practices were not adhered to under all sets of circumstances. *See* Conteh Dep. at 8. Moreover, this Court has determined that neither vessel was cognizant of the other and, consequently, any decision to dismiss the watch was in all likelihood determined without reference to the crucial presence of another vessel close-by. Although the collision certainly was caused by "error or neglect in navigation," *Director General of India Supply Mission ex rel. President of Union of India v. S.S. Janet Quinn,* 335 F.Supp. 1329, 1339 (S.D.N.Y.1971), such was not the by-product of an incompetent crew, and the Stena interests are entitled to limit their liability. *See also In re Texaco, Inc.,* 570 F.Supp. 1272, 1279 (E.D.La.

1983); *In re Louisiana, Dept. of Highways,* 455 F.Supp. 272, 281 (E.D.La.1978).

While there is no question that the Seiryu interests provided a structurally adequate vessel, *see* Amended Pretrial Order at 5, they have failed to sustain their burden of proving the competency of the vessel's crew. This failure relates to the licensure of certain officers and the processes by which they were hired as well as the inspection and follow-up procedures utilized to ensure that the vessel was complying with relevant safety and navigation provisions. The cumulative effect of these factors indicates "prior action or inaction" on the Seiryu's interests' part that "set into motion a chain of circumstances" that contributed to the casualty. *Tug Ocean Prince, Inc., supra,* 584 F.2d at 1158.

The Seiryu interests allege that Article 3 of the Korean Maritime and Port Authority Directive No. 17 of October 31, 1980, governed the manning of the Seiryu at the time of the incidents giving rise to this lawsuit. The Seiryu, a Japanese vessel bareboat chartered to a foreign corporation, was what is known in Japan as a "Maru" vessel. *See* Tanikawa Dep. at 33; 68; *see also* Murakami Dep. at 16–21 & Exh. 9. Japanese manning provisions generally do not govern such vessels,[22] but the

---

**21.** The Stena's practices therefore were in harmony with current manning standards. They did not include behavior pertaining to posting lookouts that has served as the basis for denying limitation of liability, such as hiring an insufficient number of people so that no individual ever serves watch duty as his sole function. *See Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151 (2d Cir.1978); *Northern Petroleum Tank, S.S., Co. v. City of New York,* 282 F.2d 120 (2d Cir.1960); *In re Delphinus Martima, S.A.,* 523 F.Supp. 583 (S.D.N.Y.1981). Even if one were to characterize the Stena's practices in this manner, *i.e.*—lookouts dividing their time between various duties, today the standards are such that, in the proper circumstances, allowing the watch to turn attention to other matters is considered proper, particularly when the helmsman keeps his "eye out" in the interim. Trial Transcript at 67–68; 235. Thus, the Stena was not made unseaworthy by an improper navigational practice. *See In re Thebes Shipping Inc.,* 486 F.Supp. 436, 455 (S.D.N.Y.1980); *see also In re Delphinus Maritima, S.A., supra,* at 593 n. 1 (S.D.N.Y.1981).

The delegation by owners and charterers of the responsibility of ensuring a proper lookout also has served as a basis for denying limitation of liability. *In re Tug Ocean Queen, Inc.,* 398 F.Supp. 1062 (S.D.N.Y.1974). This result has been criticized because "even the most prudent shipowners [and charterers] must be able to rely on the judgment of competent persons personally selected to man or to maintain or repair a ship." Volk & Cobbs, *supra* note 15, 51 Tulane L.Rev. at 962; *see also In re B.F.T. No. Two Corp.,* 433 F.Supp. 854, 874 (E.D.Pa.1977) (questions conclusion reached in *Tug Ocean Queen* ). In any event, the Stena's Master was instructed to comply with the Col.Regs., *see* text at 1387–1388 *supra,* and therefore was on notice that a proper look-out was to be maintained at all times. 72 Col.Regs. Rule 5. As already stated, expert testimony has confirmed that, under normal circumstances, the Stena's practices would be considered perfectly satisfactory.

**22.** "Maru" ship arrangements provide means of reducing crew costs and making Japanese ships more competitive and profitable. Tanikawa Dep. at 33, 68. Vessels must apply to the Japa-

Korean directive allegedly applicable to the Seiryu required compliance both with the standards it itself set forth *and* the relevant laws of the country in which the vessel was registered. Soo Kil Chang Dep. at 30–31; Exh. 2 to Chang Dep. Thus, Japanese provisions, summoned into play in the above manner, may have required all the Seiryu's deck officers to hold class A licenses.[23] *See* Tanikawa Dep. at 53. Third Officer Bae, who only held a class B Korean license, may thus have held inadequate credentials for his post.[24]

The distinctions between class A and class B licenses seem to relate to the extent of a seaman's training in electronic navigation equipment and his proficiency in English. *See* Chang Dep. at 21–23; S.K. Bae Dep. at 45–47.[25] The former's impact on a given crew member's ability to comply with the Col.Regs. is obvious. The latter relates to the possibility that the only radar manuals on board the Seiryu were in Japanese and English. *See* Tagaki Dep. at 87–89; Hyeon No Dep. II at 121. At least one court has noted that where the only regulation manuals on board a given vessel are in languages the crew does not understand, the vessel's managers have "diminished the crew's opportunity to become properly apprised of their duties." *In re Hercules Carriers, Inc.*, 566 F.Supp. 962, 981 (M.D. Fla.1981).

As already noted, other factors pose equally serious questions regarding the competence of the Seiryu's crew. The Seiryu's bareboat charterer had contracted with Yukiteru Shipping Company ("Yukiteru") for the latter to assume responsibility for the Seiryu's management and operation. Murakami Dep. at 8–21. Yukiteru then entered into an agreement with Dong I1 Company ("Dong I1") in which Dong I1 provided it would engage Korean officers and crew members for ships managed by Yukiteru. *Id.* at 26–27; 35; 81–88. Which of these companies actually was responsible for supervising the crew is uncertain. Neither company sent representatives to visit the vessel after the positions incident to this lawsuit were filled. Song Dep. at 55–57.[26] Moreover, no officer or crew evaluation reports were filed for at least eight months preceding the collision. *See* C.G. Kim Dep. at 109; 214; Hyeon No Dep. II at 75. Thus, the Seiryu interests had no basis on which to determine whether "its instructions, the rules of the road, [and] the [applicable] regulations ... were being read and complied with by [the vessel's] crew." *In re Hercules Carriers, Inc., supra,* 566 F.Supp. at 980. In fact, Bae testified that there were no standing orders with respect to radar plotting for navigation, Bae Dep. at 80, indicating some sort of communication gap or lack of adherence to stated navigational principles.

nese Ministry of Transport for permission to operate in this manner. The Ministry of Transport does not determine the manning that will be used on the ship or the law of the bareboat charterer that will govern such manning. This is the procedure even when the bareboat charterer is a sham corporation or the country of incorporation has no manning provisions. *Id.* at 19; 38–42.

**23.** It also has been suggested that the fact that the Seiryu's managers were Japanese in itself dictated the application of Japanese manning provisions. *See* Stena's Proposed Findings of Fact and Conclusions of Law at 24; *see also* Tanikawa Dep. at 70.

**24.** Another officer on board the Seiryu whose license may have been inadequate was Second Officer Go. Go, like Bae, *see* text *infra,* only held a class B Korean license. *See* Bae Dep. at Exhs. 1 & 1A–1G. However, Go's role, if any, in

the events leading up to and including the collision, holds much less significance than Bae's role in these incidents. Thus, the adequacy of Bae's license is the focal point of this Court's inquiry into the competency of the Seiryu's crew.

**25.** There also are differences between the level of education and the length of apprenticeship. *See generally* Chang Dep. and exhibits attached thereto. However, there seem to be no restrictions on the type of vessel or waters on which a class B license-holder may sail. *See* C.G. Kim Dep. at 261; Chang Dep. at 38.

**26.** Apparently, a company called Nanyo Shipping was supposed to call on the Seiryu every time it called at a Japanese port. However, these reports were only "to the effect that the human relationship was well-kept on board and they are keeping the vessel clean." Song Dep. at 56–57.

■ The manner in which Third Officer Bae, in particular, was interviewed for his position is troublesome.[27] Tae Kin Jeong, chief of Dong I1's seaman department, assumed that Chul Gung Kim, the assistant manager who interviewed Bae, would make Bae speak in English at his interview and test Bae in radar. Tae Kin Jeong Dep. at 13–15. Mr. Jeong also stressed the importance of both of these skills for officers on foreign sailing ships. *Id.* Mr. Kim, however, never bothered to question Bae regarding either of these two areas. Rather, he assumed that Bae could speak English because he had graduated Korean Maritime High School and assumed he was proficient in radar because Bae had obtained his license in the past two weeks. C.G. Kim Dep. at 200–01.[28]

■ As noted in *In re Ta Chi Navigation (Panama) Corp. S.A.,* 513 F.Supp. 148, 158 (E.D.La.), *aff'd,* 728 F.2d 699 (5th Cir.1984), "if incompetence results in navigational error which causes a collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the ... damage." Bae failed to put the Seiryu on a collision-free course, as was his duty pursuant to the Col.Regs. Any

relationship between this failure and his own abilities and technical training is more than mere possibility; moreover, it is a state of affairs that could have been totally avoided or, at least, ameliorated, had the Seiryu interests exercised due diligence in selecting, training, and maintaining, via follow-up inspections, officer critiques, etc., a competent crew. *See In re Hercules Carriers, Inc.,* 566 F.Supp. at 980. Thus, this Court must conclude that the Seiryu interests have not met their burden of proving that any contributions the Seiryu made to the loss were without their privity or knowledge.

## CONCLUSIONS OF LAW AS TO CARGO CLAIMS

Pursuant to the Brussels Collision Liability Convention of 1910,[29] the Seiryu cargo claimants, Okura & Co., Ltd., et al., seek recovery for damages from the Stena interests in proportion to the latter's contributory fault.

■ Since this Court already has determined that the Stena's share of liability for the collision amounts to 40% and that no negligence on the part of either vessel con-

---

**27.** Although the hiring procedure for Captain No was slightly improper in that No's recommending officer was present at the relevant personnel selection committee meeting even though he was not a member of said committee, there was no testimony that he exerted undue influence. It also was common practice to receive recommendations for candidates for vacant positions from other Dong I1 officers. Moreover, the vote of the committee members was unanimously in favor of No and, as already expressed, No possessed excellent credentials. *See* C.G. Kim Dep. at 16–17; 63–64; *see also* text at 1384–85 *supra.*

**28.** The fact that the officers and crew of the Seiryu were "approved" by either or both the vessel's owner and a hierarchy of governmental agencies does not warrant an assumption that all held the appropriate credentials to fill their respective conditions. *See* C.G. Kim Dep. at 64–83. Moreover, it certainly does not obviate the necessity of checking up on these hirees and making sure that they were following relevant instructions.

**29.** This Court determined in a prior opinion that the Brussels Collision Liability Convention of 1910 would govern all the claims involved in

this lawsuit. *See* Appendix A. Article 4 also requires damages caused to the cargo or to the effects or other property of the crews to be borne in proportion to the degrees of fault respectively committed.

This is quite different from the applicable rule in the United States, which enables innocent owners of cargo to recover the full amount of their loss from the non-carrying vessel in "both to blame" situations. *See In re Flota Mercante Grancolombiano, S.A.,* 440 F.Supp. 704, 724–25 (S.D.N.Y.1977) (citing *The Atlas,* 3 Otto 302, 93 U.S. 302, 23 L.Ed. 863 (1876); *The Beaconsfield,* 158 U.S. 303, 15 S.Ct. 860, 39 L.Ed. 993 (1895); *The New York,* 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126 (1899)); Kasanin, *Cargo's Rights and Responsibilities in Collision Cases,* 51 Tulane L.Rev. 880, 887 & n. 62 (1977); *see also* Waesche, *Cargo's Rights in Collision Cases,* 45 Tulane L.Rev. 781, 782 (1971). The non-carrying vessel in the United States is then entitled to include payments to cargo as part of its overall damages in relation to the carrying vessel. *See id.; see also The Chattahoochee,* 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 80 (1899).

stituted an intervening fault shielding such vessel from liability for the sinking of the Seiryu, *see* text *supra*, the Seiryu cargo claimants are entitled to recover from the Stena 40% of their damages resulting from the collision.[30]

The Stena Freighter declared general average[31] for alleged sacrifices arising out of the subject collision. *See* Amended Pre-Trial Order at 4. Moreover, as required by the relevant marine cargo insurance policies, the marine insurers guaranteed the owners of the Stena to pay, on behalf of the Stena cargo claimants, any proper amounts in general average for which the claimants would be liable to contribute by reason of the sacrifices allegedly incurred as a result of the subject collision. *Id.* It is these general average contributions that constitute the Stena cargo claimants' claim against the Seiryu (the non-carrying vessel), her owner and bareboat charterer. *See* Trial Memorandum of Law on Behalf of Stena Freighter Cargo Claimants at 3. *See also Aktieselskabet Cuzco v. The Sucarseco*, 294 U.S. 394, 399, 404, 55 S.Ct. 467, 469, 471, 79 L.Ed. 942 (1935). Under Article 4 of the Brussels Convention, their claim also is limited to the degree of fault adjudicated against the owner and bareboat charterer of the Seiryu. *See* Stena Freighter Cargo Claimants Trial Memorandum at 4.

The Seiryu interests allege that even if the applicable bills of lading contained the usual "Jason" clause, the Stena would not be entitled to recover general average contributions from the Stena cargo claimants because the vessel's failure to exercise due diligence in making the Stena seaworthy would have barred any defense to claims for cargo damage under the United States Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq. See* Amended Pretrial Order at 28; *see also* Trial Memorandum of Seiriki Kisen Kaisha and Dragon Navigation, S.A. at 62–64. Even on the assumption that the Seiryu interests correctly assert the applicable law and frame the relevant inquiry, this Court must reject their argument.

COGSA, which applies to foreign commerce "from the time when the goods are loaded on to the time when they are discharged from the ship," 46 U.S.C. § 1301(e), "insulate[s] the carrier from liability to cargo for errors in navigation and management, as long as the shipowner has exercised due diligence in furnishing a seaworthy ship." Kasanin, *Cargo Rights and Responsibilities in Collision Cases*, 51 Tulane L.Rev. 880, 883 (1977); *see also* 46 U.S.C. § 1304(1) and § 1304(2)(a). This defense to cargo claims also relates to "Jason" clauses, clauses in bills of lading which require cargo claimants to contribute to general average expenditures when the carrier has a defense to cargo damage claims. *See The Jason*, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1912); *see also* G. Gilmore & C.L. Black, *The Law of Admiralty* § 5–13 at 266–67 (2d ed. 1975).[32]

Because the Stena interests exercised due diligence in making the vessel seaworthy (*see* text at 1387–88 *supra; see also* Kasanin, *supra*, at 884–85; Gilmore &

---

**30.** This recovery is once again subject to the vessel owner's right to invoke the benefits of the Limitation of Vessel Owner's Liability Act. *See* Waesche, *supra* note 29, at 789. As such, the Stena's entitlement to limit its liability, established in text 1387–1388 *supra*, also applies to the Seiryu cargo claimant's recovery.

**31.** *See* Waesche, *supra* note 29, at 783; *see generally*, Gilmore & Black, *supra*, at §§ 5–1—5–16.

**32.** As noted by Gilmore & Black, the "new-style" version of the "Jason" clause is drafted to take advantage of every immunity granted by COGSA and other statutes and generally reads as follows:

"In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods." Gilmore & Black, *supra*, § 5–13 at 267.

Black, *supra,* at 150–60),[33] the vessel is immunized against cargo claims and entitled to general average contributions.[34] *See In re Flota Mercante Grancolombiana, S.A.,* 440 F.Supp. 704, 725–26 & n. 9 (S.D.N.Y.1977). Thus, the Stena cargo claimants can recover the amount of their contributions from the Seiryu interests, *Aktieselskabet Cuzco, supra,* 294 U.S. at 404, 55 S.Ct. at 471, as limited by the latter's portion of liability. The Stena cargo claimants therefore are entitled to recover 60% of the amount of such contributions from the Seiryu, its owner and bareboat charterer.

## SUMMARY CONCLUSION

This Court has determined that the proper division of liability allocates 60% of the fault to the Seiryu and 40% to the Stena. It also has determined that neither vessel's post-collision actions constituted intervening faults that would serve to limit the other vessel's liability for the sinking of the Seiryu. With regard to petitions for limitation of liability, this Court concludes that the Stena interests have sustained their burden of proving that their vessel's contributions to the casualty were without their privity or knowledge. However, the Seiryu interests failed to sustain this burden and are not entitled to limit their liability. Finally, with regard to the cargo claims, this Court has determined that the Seiryu cargo claimants are entitled to recover from the Stena 40% of their damages resulting from the collision, subject to the Stena interests' entitlement to limit liability. The Stena cargo claimants are entitled to recover 60% of their general average contributions from the Seiryu.

Settle order.

## APPENDIX A

THE COURT: This matter is before the Court at this stage of the proceedings solely for the purpose of resolution of the preliminary but highly significant issue of which country's laws shall determine certain rights of the cargo owners.

The Court has had the benefit of extensive briefing and oral argument, and is prepared to render its decision reserving its right to make stylistic amendments and addition of citations to this oral opinion.

The facts:

This issue arises out of a collision between the Cayman Islands flag vessel Stena Freighter and the Japanese flag vessel Seiryu on October 29, 1981, approximately eight and a half miles off the western end of Cuba.

At the time of the collision, the Seiryu was en route from Japanese ports to Houston, Texas, and the Stena Freighter was en route from Miami, Florida to Las Minas, Panama.

The Stena Freighter sustained damage and the Seiryu sank, becoming with her cargo a total loss.

---

**33.** Although there is authority for the proposition that the Limitation Act, 46 U.S.C. § 181 *et seq.,* imposes a lower standard of care on the shipowner than COGSA, it has not been restated in recent cases. *See* Gilmore & Black, *supra,* § 10–20 at 878 & n. 86; *see also Southern Pacific Co. v. United States,* 72 F.2d 212, 215 (2d Cir. 1934). Whatever the comparative burdens of either standard of care, however, the Stena interests have met them. As noted by Gilmore & Black: "Seaworthiness is a comprehensive term, and a relative one. The requirement is that the vessel not only be staunch and strong, but also that she be fitted out with all proper equipment in good order, and with sufficient and competent crew and complement of officers." Gilmore & Black, *supra,* § 2–6 at 65; *see also id.* at 151 & n. 41. This echoes the standards by which this Court measured the Stena's entitle-

ment to limit its liability under the Limitations Act. *See* text at 1387–88 *supra* and accompanying notes; *see also* Kasanin, *supra* note 29, 51 Tulane L.Rev. at 884 (two most common grounds for unseaworthiness under COGSA in collision cases are manning deficiencies, *i.e.,* failure to provide a competent crew, and equipment deficiencies).

**34.** Under COGSA, the usual procedure is that cargo must prove unseaworthiness of the vessel and causation; then, the burden shifts to the shipowner to prove "due diligence" or lack of causation. Kasanin, *supra* note 29, 51 Tulane L.Rev. at 884 n. 34. However, the positions taken by the litigants warrant the approach followed above.

The parties have stipulated to the jurisdiction of the Southern District of New York over these proceedings.

The issue:

Stena Freighter contends that since there was a collision on the high seas more than three miles from shore between vessels whose flag countries had the same substantive law, the law of the flags determines the rights of the parties insofar as they are relevant here.

By notice served pursuant to the Federal Rules of Civil Procedure 44.1, attorneys for the Stena Freighter interests advised the parties of their intention to assert the applicability of article 4 of the Brussels Collision Convention of 1910 (hereinafter "Brussels Convention"), which states in relevant part:

"If two or more vessels are in fault, the liability of each vessel shall be in proportion to the degree of the faults respectively committed. The damages caused either to the vessels or to their cargoes or to the effects of other property of the crews, passengers, or other persons on board, shall be borne by the vessels in fault in the above proportion without joint and several liability toward third parties."

Cargo, which has settled its claims against the Seiryu, contends that its rights against the Stena Freighter should be determined by Cuban law, because as noted, the collision took place approximately eight and a half miles off the western end of Cuba, and Cuba asserts that its territorial waters extend twelve miles from its coast.

The parties have stipulated that under Cuban law cargo interests may look to either or both vessels for full reimbursement of losses suffered in a collision, which rule is embodied in article 827 of the Cuban Commercial Code and is presently in effect.

The significance of this issue arises because without joint and several liability car-

go interests would be limited in their damages to the respective fault distributions of the Seiryu and Stena Freighter which would significantly limit the possible recovery, especially in light of the fact that both parties are seeking to limit their prospective liabilities under the limitation statutes.

Thus, this court is called upon to determine, one, whether the accident took place in Cuban territorial waters or on the high seas; and secondly, whether this determination controls the law applicable insofar as allocation of damages is concerned.[1]

I. *The accident took place on the high seas.*

■ The collision occurred more than eight miles from the western end of Cuba on October 29, 1981.

We first examine the status of those waters insofar as the American courts are concerned as of the date of the collision. We next will inquire whether any subsequent developments alter this status for the purposes of this proceeding.

As of October 29, 1981, the United States did not recognize territorial claims in excess of three miles. The role of the court with respect to such a determination is a limited one. The question of how far a country's territorial claims may validly be asserted is a problem which relates to the foreign relations of this country, and is peculiarly an executive function.

In a number of cases cited by the Stena, it has been held that an assertion by a country off whose coast a collision took place of territory extending beyond three miles would not be honored by the American courts because it was contrary to the position of the American government. *See Esso Transport Co. v. Terminales Maracaibo*, 356 F.Supp. 1367 (S.D.N.Y.1973) (Venezuelan waters); *MISR Insurance Co. v. Motor Vessel Har Sinai*, 480 F.Supp.

1. Both the law of the United States (since the decision in *United States v. Reliable Transfer Co.*, 421 U.S. 297 [420 U.S. 970, 95 S.Ct. 1388, 43 L.Ed.2d 650] (1975)) and of the Brussels Convention divide damages proportionately based on comparative fault. Under the Brussels Convention, liability is not joint and several. Under both Cuban and American law, however, liability for total damages is joint and several. Therefore, if Cuban law applied by virtue of the application of the *lex loci* rule, or American law applied because the issue of division of damages was held to be procedural, the vessels would be jointly and severally liable.

398 (S.D.N.Y.1979) (Greek waters), *aff'd*, 628 F.2d 1345 (2d Cir.1980).

Although Cuba has at all relevant times claimed a 12-mile extension of its territorial waters, that claim would not as of the date of the accident have been honored by an American court. Thus, as of the date of the collision, the waters in which the collision took place were the high seas.

Certain cargo claimants cite events subsequent to October 29, 1981, the date of the collision, as evidencing a change in the United States' position with respect to claims of extensions of territorial water beyond three miles, and urge that these subsequent developments make the cases upholding a three-mile limit and refusing to go beyond that limit no longer valid.

Cargo cites the issuance by President Reagan on March 10, 1983, of three statements including Proclamation NO. 5030, "Exclusive Economic Zone of the United States of America," and "White House Fact Sheet," 19 Weekly Compilation of Presidential Documents, 383–385, 397.

This Proclamation together with a policy statement was said to have been issued to conform critical areas of United States foreign policy to that of other nations as embodied in the United Nations Convention on the Law of the Sea.

The policy statement made this initial declaration:

"First, the United States is prepared to accept and act in accordance with the balance of interests relating to traditional uses of the oceans such as navigation and overflight. In this respect, the United States will recognize the rights of other states in the waters off their coasts as reflected in the convention so long as the rights and freedoms of the United States and others under international law are recognized by such coastal states."

In the fact sheet referred to above, it was stated:

"The President has not changed the breadth of the United States territorial sea. It remains at three nautical miles. The United States will respect only those territorial sea claims of others in excess of three nautical miles to a maximum of 12 nautical miles which accord to the United States its full rights under international law in the territorial sea."

Cargo claims that by virtue of a maritime boundary agreement as of December 16, 1977, Cuba was a country which accorded reciprocal territorial rights to the United States, and that therefore, the President's proclamation of March 10, 1983, was immediately applicable to Cuba, was immediately effective, and indeed, was retroactive to October 29, 1981.

We disagree. First, the language of the Proclamation itself is not the language of a self-executing document. Rather, it speaks of what the United States is prepared to accept. It is cast in terms of what the future position and policy of the United States government will be.

The court was advised in the memoranda submitted in this proceeding and at oral argument just concluded that no acts have been taken subsequent to March 10, 1983 to implement that proclamation, not with respect to Cuba nor with respect to any other country.

The boundary agreement of 1977 which the cargo interests claim made clear the applicability of the proclamation to Cuba appears to relate solely to the north-south boundary claims of the United States and Cuba and not to the matter now at issue.

Even if one were to assume *arguendo* that a consequence of this proclamation without any further implementation was to alter the traditional United States view with respect to recognition of foreign claims concerning territorial waters, there would be the further question whether this proclamation is to be given retroactive effect.

To do so would be not merely to apply a rule retroactively, that is, a rule of law retroactively, which is done or not done based on various criteria which are set forth in numerous cases, but would entail a determination that the sovereignty of a

geographical area was altered retroactively.

The consequences which this might entail to parties other than those presently before the court, and with respect to issues not presently before the court, cannot be determined.

The other treaties which have been proposed which would also alter the extent of United States recognition of such territorial claims have not been adopted by the United States and are not effective and are not binding.

We conclude, therefore, that the collision took place on the high seas.

If the collision took place on the high seas, then the law common to the flags of both vessels is applicable to the collision. This is the rule stated in section 410(a) of the Restatement of Conflicts enunciating a principle established by the Supreme Court in *The Belgenland* 114 U.S. 355, 370 [5 S.Ct. 860, 867, 29 L.Ed. 152] (1880).

II. *Division of Damages is a Matter of Substantive Law*

▮ Cargo urges that the particular matter at issue here, which is the division of damages, should be determined pursuant to the law of the forum, because it is procedural, even if one were to conclude that matters of substantive law are dealt with by the law of the flag of the two vessels.

We disagree. We believe that the principle is well established that division of damages is a matter of substantive law, not procedure, as indicated by *The Belgenland* decision supra, and *The Mandu,* 102 F.2d 459, (2d Cir.1939).

As one commentator has written:

"The principles of the division of damages are not mere matters of remedy or of procedure, to be applied in accordance with the law of the forum; they determine the actual rights of the parties and are, therefore, to be treated as part of the substantive law applicable to the collision ... Consequently, if both vessels are subject to the same foreign law, the division of damages must be in accordance with that law.

Griffin on Collision § 248, at 565 (1949).

This conclusion renders it unnecessary for us to determine whether, as the Seiryu argues, modern choice-of-law principles would compel application of the Brussels convention even if the collision had occurred within Cuban territorial waters. We need only note that while we do not decide the case on that basis, we find that the arguments in support of that position have considerable weight. *See Lauritzen v. Larsen,* 345 U.S. 571 [, 73 S.Ct. 921, 97 L.Ed. 1254] (1953); *Cruz v. Maritime Company of Philippines,* 549 F.Supp. 285, 288 (S.D.N.Y.1982), *aff'd,* 702 F.2d 47 (2d Cir.1983).

We recognize, of course, that the traditional view is that set forth in *The Mandu:*

"Liability for tort caused by collision in the territorial waters of a foreign country is governed by the laws of that country." 102 F.2d at 463.

Whether that remains as absolute a principle as it was when *The Mandu* was decided is far from clear. Insofar as the equitable considerations are concerned, here the grounds for application of American law other than the stipulation of the parties that this court would have jurisdiction of the matter are slim. Further, as the court in *The Mandu* noted, the consequence of its determination was to relegate the cargo owners to the law which governed the ship on which they were content to ship their goods. It would appear that no more than that occurs here. There certainly has been no reliance on Cuban law.

For the reasons which I have just stated, the court concludes that the matter is governed by the Brussels Convention of 1910, and the rule for the division of damages set forth in that convention.

MEMORANDUM ENDORSEMENT

▮ The Stena has moved for reconsideration urging that, even if the Seiryu's crew was not "grossly negligent" in its post-collision acts and omissions, as the Court has previously determined, it was

"negligent" and that the allocation of responsibility for the loss should thus be modified to reflect this circumstance. Apart from questions relating to the timeliness of the Stena's motion and the fact that it is predicated on a revision of positions previously taken, we are now satisfied after reviewing all of the evidence, including that relating to the extreme damage to the Seiryu that occurred upon impact and the difficulties inherent in separating, towing and salvaging the vessel, that the Stena has not shown negligence (or gross negligence as heretofore alluded to by the Stena) on the part of the Seiryu's crew that was a proximate cause of the Seiryu's sinking. In short, we conclude that the Seiryu was doomed to sink from the moment of impact with the Stena, a conclusion we had previously found it unnecessary to reach. *See In re Complaint of Seiriki Kisen Kaisah and Dragon Navigation, S.A.,* supra at n. 12 (1986).

The Court therefore denies Stena's motion for an order pursuant to F.R.Civ.P. 52(b) and/or 59(e) to amend its prior Opinion, Findings of Fact and Conclusions of Law and to increase the Seiryu's proportion of fault for damages resulting from its alleged post-collision negligence.